# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-05-00633-CR

**Rosa Estella Jimenez, Appellant**

**v.**

**The State of Texas, Appellee**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 299TH JUDICIAL DISTRICT
NO. D-1-DC-04-904165, HONORABLE JON N. WISSER, JUDGE PRESIDING**

## O P I N I O N

The jury convicted Rosa Estella Jimenez of the offenses of felony murder and injury to a child. *See* Tex. Penal Code Ann. § 19.02(b)(3) (West 2003), § 22.04(a)(1) (West Supp. 2006). Punishment was assessed at 75 years' imprisonment for felony murder and 99 years' imprisonment for injury to a child. In five points of error, Jimenez challenges the legal and factual sufficiency of the evidence supporting her convictions, complains of prosecutorial misconduct, alleges ineffective assistance of counsel, and asserts a double jeopardy violation. We affirm the judgment.

## BACKGROUND

The jury heard evidence that on January 30, 2003, Jimenez, a 20-year-old woman, was babysitting B.G., the 21-month-old child of Victoria Gutierrez. Gutierrez testified that Jimenez babysat B.G. two or three times a week, at Jimenez's apartment, during the day while Gutierrez worked. Gutierrez testified that B.G. liked to play with objects in her kitchen and "take everything

out." Gutierrez recounted how B.G. liked to "drop" the objects from the kitchen into the toilet. Gutierrez also explained that B.G. liked to play with paper and that he once placed an entire roll of toilet paper into the toilet. Gutierrez emphasized, however, that B.G. never put paper towels in his mouth.

Irene Vera was Jimenez's neighbor. Vera testified that on the day of the incident, Jimenez came to her door crying, asking for help, and holding B.G., who looked "limp and purple." Vera asked Jimenez to tell her what had happened. Jimenez responded that she thought B.G. had swallowed something. Vera took B.G. from Jimenez, placed him on the floor, and attempted to check the inside of his mouth. However, she could not get her finger very far into B.G.'s mouth because he kept biting down on it. Vera noticed "a little bit of blood" in B.G.'s saliva "coming out the sides of his mouth." The blood appeared to be fresh.

Vera tried to ascertain more details from Jimenez about what had happened to B.G. Jimenez, according to Vera, explained that B.G. had been walking toward Jimenez when she saw that B.G. was choking. B.G. then fell to the floor. Jimenez picked him up and "started slapping him on the back" to try to dislodge whatever was choking him. Jimenez also put her fingers in B.G.'s mouth and looked inside but could not find anything. According to Vera, Jimenez thought that B.G. might be choking on a toy. Jimenez told Vera that she immediately brought B.G. over to Vera's apartment.

While Vera was trying to help B.G., another neighbor, Paula Salinas, called 911. The conversation between Salinas and the 911 dispatcher was transcribed and admitted into evidence. Salinas first told the dispatcher that it looked like B.G. was not breathing, that he was bleeding from

2

the mouth, and that he was already dead. The dispatcher instructed Salinas to get closer to B.G., and once she did, Salinas reported that B.G. was still breathing and that it looked like he was trying to throw up. When a police officer arrived at the scene, the dispatcher heard the officer state, "No pulse, not breathing, CPR in progress." The dispatcher testified that sometimes lay people mistake "agonal" respirations for breathing, and that this could explain the discrepancy between Salinas's statement that the child was breathing and the officer's statement that the child was not breathing. The dispatcher testified that the time between when a person stops breathing and the time a person can no longer move is four to six minutes. The dispatcher remained on the phone throughout the incident. The dispatcher recorded the following times during the call:

13:28  911 call comes in

13:31  Police officer arrives

13:32  EMS arrives

14:20  EMS closes out the call (which is when, according to the dispatcher, EMS transports the patient to the hospital).

The Austin Police Department officer who responded to the 911 call was William Torres. Officer Torres also testified at trial. When Officer Torres arrived at the apartment, he noticed B.G. lying on the floor on his back with Vera kneeling on his right side, checking his breathing. Torres immediately knelt down on B.G.'s left side, lifted and held B.G.'s head and neck, listened for a breath, and checked for signs of life. Torres could not feel a pulse. He explained:

He had a little bit of blood on his cheek, but there was no movement at all. . . . His eyes were wide open. They wouldn't even move. His lips were blue and starting to

3

get puffy. His mouth was open but not all the way. . . . Because I remember when I put—I tried to put my finger in there, it would only go about half way.

Torres then performed CPR on B.G. B.G. did not respond, and this indicated to Torres that "the airway [was] not going through to his chest" and that there was something stuck in B.G.'s throat.

Shortly after EMS arrived and began treating the child, Torres went outside the apartment to check on Jimenez, whom Torres initially had assumed was B.G.'s mother. Torres testified that Jimenez was crying and screaming, "How is he? How is he? Is he okay? Is he okay?" Torres replied that he did not know. One of the EMS technicians came outside and asked if B.G. had swallowed anything. According to Torres, Jimenez responded that B.G. had been playing with toys, but that she did not know what he had swallowed.

Torres began asking Jimenez questions to obtain additional information about B.G. Torres soon discovered that B.G. was not Jimenez's child. He asked Jimenez if she knew how to contact B.G.'s mother. Jimenez responded that she had written the mother's telephone number on a magazine in her apartment. Torres then accompanied Jimenez to her apartment to search for the magazine. Torres testified that while they were looking for the magazine, Jimenez explained repeatedly that B.G. and Jimenez's one-year-old daughter had been playing with toys while Jimenez was cooking, and that while she was cooking, she called out for B.G. to bring her a roll of paper towels. When B.G. did not respond, Jimenez went to look for him and found him lying on the floor and not breathing.

Jordan Rojo, one of the EMS paramedics, testified that when she and fellow paramedic Rob Curr arrived at the scene, they observed that B.G. was not breathing and had no

4

pulse. His lips had already turned blue from lack of oxygen. Rojo opened B.G.'s mouth with her hand, looked down his mouth, and found no obstruction. Rojo attempted unsuccessfully to force air into B.G.'s lungs. Curr then attempted to intubate B.G.[1] With the aid of a laryngoscope, Curr noticed an obstruction "entirely covering the trachea." Using forceps, Curr attempted to remove the object. Curr immediately noticed that the obstruction was "falling apart," and initially he was only able to dislodge two "dime-sized" pieces of it. Rojo, who believed that B.G. was choking on food, asked Curr if the object was brisket because "it was red and kind of looked fleshy like meat." Curr told her that it was paper. On the third attempt to remove the obstruction, Curr pulled out the remainder of the object. Curr testified that when the object finally dislodged, "it made a very sickly sucking sound." Because of the object's size, Curr had difficulty extracting it past B.G.'s teeth. Rojo described the object as a "large mass" of "blood soaked"[2] paper towels, "the size of a large egg."[3]

Rojo explained that she was shocked at the size of the mass, how far into B.G.'s airway it had been lodged, and the amount of blood on it. She testified that at this point, she no longer believed that B.G. had accidentally choked. Curr testified that he was also surprised, as he

[1] Intubation, as described in the record, is the process of inserting a tube through a person's vocal cords directly into the trachea to enable the person to breathe.

[2] The report filed by Rojo and Curr also referred to the item as "soaked." However, during the defense's case-in-chief, Curr was recalled to the witness stand and testified that the paper towels, although wet, were not "soaked to the point where water's running off of it."

[3] The exact size of the mass at the moment it was removed from B.G.'s throat is unclear from the record. At the time it was photographed, it measured approximately three inches in length and width and was approximately one-and-three-fourths inches thick. However, several witnesses testified that the wad of paper towels likely expanded in size after it was removed from the child's throat and began to dry.

was expecting to find "a food product or a toy" because "[t]hat's typically what children choke on." He was not expecting to find "a wad of paper towels."

The paramedics then transported B.G. to the hospital. Board-certified pediatric emergency physician John Boulet treated him in the emergency room. Dr. Boulet testified that B.G. was "completely comatose" by the time the child arrived in the ER. One of the paramedics showed Boulet the wad of paper towels that had been recovered from B.G.'s throat. Boulet recounted that the wad appeared to be close to the size of his fist. Boulet testified that in his opinion, an object of such a size would not go down a child's airway accidentally, that "it would have to be put down there." Boulet was also asked his opinion regarding whether a 21-month-old child would be capable of putting an object of that size "down that far into his airway." Boulet stated that a 21-month-old child would not be capable of such an act because the child's gag reflex would prevent the child from pushing such an object that far down his throat.

Dr. Patricia Oehring, a pediatric intensivist who specializes in the critical care of children, treated B.G. following his transfer from the emergency room to the intensive care unit. Dr. Oehring testified that B.G. had suffered a "hypoxic brain injury" due to lack of oxygen caused by the obstruction in his airway. Oehring also explained that B.G.'s brain had been deprived of adequate oxygen for "probably 30 or 40 minutes" and that this was "absolutely not" consistent with Jimenez's claim that she "immediately" rushed B.G. over to Vera's apartment once she discovered B.G. choking. Oehring further testified that it takes as long as 45 minutes to an hour for a heart to stop beating after being completely deprived of oxygen.

A few hours after B.G. had been admitted to the hospital, Oehring was shown a picture of the obstruction. Oehring testified that "it looked like an organ that had been removed from a body, actually. It was not identifiable as paper towels." She further described it as a "clump of white tissue that was covered with blood." Oehring explained in great detail, without objection from defense counsel, why she believed that it was not possible for B.G. to place this object down his throat:

> There is no way that [B.G.] put this in his mouth . . . all by himself. . . . By the time a child is almost two, they have other ways to explore their environment. They don't . . . explore it by mouthing things. . . .
>
> Two year olds definitely put things in their mouths, but . . . by the time they're almost two, they put things in their mouths that either look like they're going to taste like candy or they look like food or they look like something to drink. They drink lamp oil. They put beads in their mouth . . . . If it doesn't taste good or have an interesting texture, they're not going to leave it in their mouths. They're not going to shove it to the back of their mouth.
>
> Things that slip down are things like beads or small toys, or buttons or eyes off of Teddy bears, coins, things that are slippery that are going to, you know, slide on—when on a tongue that's covered with saliva or something that they're going to leave in their mouths and suck on and then trip and have it slide down. But children don't suck on paper towels.

Oehring also testified that B.G.'s gag reflex would have prevented him from forcing a large object down his own mouth: "[H]e'll gag as soon as you hit the soft palate . . . it's pretty early in the mouth. And there's a reflex that goes all the way . . . into your airways in your lungs there's a reflex. . . . And so . . . there's no such thing as bypassing a reflex."

Oehring further testified that in her opinion, an adult put the paper towels in B.G.'s throat. Oehring was allowed to explain, without objection from defense counsel, how this could occur:

> He would have had to have been held down. If you've ever tried to keep almost a two year old in one place, he'd have had to have been held down, I would imagine, probably on the floor with some part of somebody's body holding him in that one position. Once that some—somebody's hand and a paper towel was in his mouth, that would—and if it was pushing backwards against the floor, he would—it would probably hold his head still enough. But he would have been coughing and gagging and bleeding and fighting and struggling up to the point where his brain didn't get enough oxygen to where he became limp.

Oehring also explained that a 21-month-old child swallowing five paper towels would be the equivalent of an adult swallowing ten paper towels, and that it "would take a lot of force" to push something that size down a child's airway, which Oehring testified was "at best the size of a quarter at the point where those paper towels were pulled out." Such force, Oehring explained, would cause the tissue inside the airway to stretch, tear, and bleed.

Finally, Oehring testified that a 21-month-old child would not have the strength or the dexterity to "wad" the paper towels together to the point where they would be capable of being put down his mouth, much less the amount of saliva necessary to wet the paper towels so that they could fit inside his mouth. Oehring speculated that the wad must have been soaked "in water or something" before being placed in B.G.'s mouth.

Because of the nature of B.G.'s injuries, the police department had initiated a criminal investigation of the incident. The department assigned detectives Keith Walker, Eric De Los Santos, and Mark Gilchrest to the case. Detective Walker arrived at the scene shortly after EMS had

8

transported B.G. to the hospital. Walker testified that he searched Jimenez's apartment. Inside, he discovered a roll of paper towels located on a sofa in the living room. One of the sheets was separated from the roll. In the bathroom, Walker observed a red spot on the faucet handle that appeared to be dried blood and also what appeared to be a blood smear on the edge of the bathtub. Officers seized the paper towels and faucet handle from the apartment and took samples of the substance found on the bathtub. Testing confirmed that the substance on the faucet and the bathtub was blood consistent with B.G.'s DNA profile.

The police transported Jimenez to department headquarters where Detective De Los Santos interviewed her.[4] The interview, conducted in Spanish, was videotaped and transcribed into both Spanish and English. The jury watched the videotape while reading copies of the transcript.[5] De Los Santos also testified concerning the interview.

During the interview, Jimenez told De Los Santos that B.G. and her one-year-old daughter were both suffering from a cold that day, and that at one point she had used a paper towel to blow B.G.'s nose, left a roll of paper towels on the sofa, and then went to the kitchen to cook. Jimenez then noticed that B.G. and her daughter were playing with the paper towels. She told B.G. to stop. However, B.G. continued playing with the paper towels, tearing sheets from the roll and throwing them. Jimenez then saw B.G. go the bedroom, leaving the roll of paper towels behind on the sofa. Later, Jimenez told B.G. to "come over here where I can see you" because she did not want

---

[4] De Los Santos testified that Jimenez was not under arrest during the interview and that she was free to leave at any time. The voluntariness of Jimenez's statements during the interview and whether they were the product of custodial interrogation are not issues on appeal.

[5] The transcript contained both the Spanish and the English versions of the interview, with the Spanish on the left side of the page and the English on the right side of the page.

him to enter the bathroom and put his hands into the toilet bowl. Jimenez then saw B.G. coming toward her, "walking very slowly" with his hand on his throat. She saw that he was very red, asked him what was wrong, and when he did not answer her, became concerned that he was choking on something. Jimenez approached B.G., took him to the bathroom because he looked like he was trying to throw up, squeezed his cheeks together and put her fingers in his mouth to try to look inside, and hit him on the back to try to dislodge what was in his throat. When these measures proved unsuccessful, she carried B.G. over to her neighbor's apartment. Jimenez told De Los Santos that only one minute elapsed between the time that she saw B.G. choking and the time that she took him over to her neighbor's apartment.

Later in the interview, as De Los Santos further questioned Jimenez about the incident, Jimenez began crying and stated, "I love [B.G.] a lot, as if he were my boy. Out of carelessness, was what happened to him [sic]." Jimenez denied putting the paper towels in B.G.'s mouth. However, under repeated questioning from De Los Santos, Jimenez claimed not to remember if she did or not:

[Jimenez]: I only remember that I opened his mouth. But due to nervousness from . . . not knowing what to do, I don't know if I pushed the paper . . . I don't remember, from the nerves, you see?

[De Los Santos]: Uh-huh.

[Jimenez]: I don't remember well.

[De Los Santos]: Is it possible?

[Jimenez]: Maybe, I don't know.

10

| [De Los Santos]: | But you have told me that— |
|---|---|
| [Jimenez]: | Yes, look, I opened his mouth. |
| [De Los Santos]: | Uh-huh. |
| [Jimenez]: | But at that moment, I opened his mouth and I don't remember. . . . |

During the interview, De Los Santos noticed injuries on Jimenez's right hand. These injuries, which appeared to be scrapes and abrasions on her thumb and forefinger, were later photographed. De Los Santos asked Jimenez about the injuries, and Jimenez again responded that she did not remember what happened:

| [Jimenez]: | I'm telling you, maybe I put my hand inside the little boy— I don't remember. |
|---|---|
| [De Los Santos]: | But I'm asking you, how does it look [to] you? |
| [Jimenez]: | To me? As if the little boy had bit me. |
| . . . . | |
| [Jimenez]: | Uh-huh. And I don't remember if . . . if at that moment when I did this, after I did this . . . from there on I don't remember if . . . if I . . . put the hand in his mouth. I can't remember. |
| . . . . | |
| [De Los Santos]: | [T]ry to remember. . . . |
| [Jimenez]: | Possibly when . . . I saw that he was choking. When he was going to ask me for help. . . . |
| . . . . | |
| [De Los Santos]: | But did he bite you? |

11

[Jimenez]: It can be seen that he bit me.

Throughout the interview, Jimenez was concerned about her daughter, who had been taken into protective custody by CPS. At one point during the interview, Jimenez was allowed to call Vera to ask about her daughter. During the phone call, Jimenez stated the following:

They're saying it was me. That they want to say it was me. They're saying that . . . they're trying to say it was me. Oh! I don't know anymore. I mean, how is it possible that the little boy put so much paper in his mouth?

Later in the interview, Jimenez asked De Los Santos if she could speak with him "as a friend." De Los Santos agreed and accompanied her outside. Unbeknownst to Jimenez, De Los Santos was carrying a digital audio recorder in his pocket, and he recorded their conversation. The recording and a transcript of the recording were admitted into evidence. During the conversation, Jimenez asked De Los Santos, "If I were to tell you that I did it, what would happen?" De Los Santos answered that he would present that information to the attorneys, and that there was a possibility that she would go to prison. Jimenez then asked about how long she could go to prison, and De Los Santos told her that he did not know. De Los Santos then asked Jimenez more questions about the incident, but she did not want to talk about it until she first saw her daughter.

Once they returned to the interview room, De Los Santos made arrangements with CPS to allow Jimenez to visit with her daughter at the station, hoping that this would encourage Jimenez to explain what happened. However, even after she saw her daughter, Jimenez refused to answer De Los Santos's questions. He finally asked her, "But I want to know why. Please. Just tell me here, why did it happen?" Jimenez responded, "I can't." De Los Santos then ended the interview

12

and agreed to drive Jimenez to her home. De Los Santos testified that Jimenez said nothing of significance in the car. In the meantime, Detective Gilchrest was obtaining a warrant for Jimenez's arrest. Several hours after she returned home, Jimenez was arrested and charged with injury to a child.

Jimenez was later also charged with felony murder when B.G. died from his injuries approximately three months after the incident. Dr. Elizabeth Peacock, Deputy Medical Examiner for Travis County, testified that the cause of death was damage to the brain due to lack of oxygen. Although she did not perform the actual autopsy, Dr. Peacock reviewed the autopsy report and concurred with the actual examiner's finding that the death was a homicide.[6] She testified that the finding was not a close call. Peacock was asked to explain why a 21-month-old child would not be able to place a large object into his airway. Peacock testified that "the physics of it are impossible":

> The mouth of a 21-month-old can hold a lot of food. However, right at the back of the mouth, it narrows abruptly to a rather small opening. And by small, I am talking less than an inch in diameter. The only things that can really get down there and obstruct, in my opinion, and in the . . . forensic texts are something that's round or small to that degree.

However, Peacock testified that it would be possible for an adult to force a large object down a child's throat. Following Peacock's testimony, the State rested its case.

---

[6] The medical examiner who performed the autopsy was Dr. Vladimir Parungao. The defense called him as a witness, attacking his credibility and questioning his finding that the death was a homicide, suggesting that his conclusion was influenced by what the police officers had told Parungao about the status of the investigation and whether Jimenez had confessed to the crime. On cross-examination, Dr. Parungao stood by his finding that the death was a homicide.

13

Several witnesses testified for the defense, including Paula Salinas, the neighbor who had called 911. Salinas testified that on the day of the incident, she was in her living room when she heard "this horrible scream." Salinas ran outside and saw Jimenez standing outside Vera's apartment yelling and crying. Salinas had her cell phone with her, and Vera asked her to call 911. While Salinas was calling 911, she heard Jimenez asking B.G., "Mi hijo, what's wrong? What's wrong? What's wrong?"

Faye Halliburton testified that she had read about the case in the newspaper and had contacted the defense to inform them that her daughter had choked on Kleenex tissue paper when she was almost two years old. On cross-examination, Halliburton testified that when she was able to pull the Kleenex out of her daughter's mouth, it did not have blood on it.

Jimenez's husband, Fidel Juarez, testified that his wife treated their children "[w]ith a lot of love and care." Juarez also testified that when he came home for lunch during the day, he would often observe B.G. playing with paper towels and that B.G. liked to put paper towels in his mouth. On cross-examination, Juarez denied the State's accusation that he was fabricating his testimony in order to help his wife.

The jury also heard testimony from Wilson Young, a DNA/serology analyst with the Department of Public Safety, who had analyzed the objects that were seized from Jimenez's apartment and the paper towels that were extracted from B.G.'s throat. Young testified that Jimenez's DNA was not found on the paper towels. However, on cross-examination Young explained that this did not necessarily mean that Jimenez did not touch the paper towels. Young explained that "[t]o just touch an item for a short period of time would not release sufficient cells

14

from the hands or from the body . . . to test them for that [DNA analysis]." Additionally, according to Young, because the paper towels had been collected from the mouth of another person, "that would then create a situation such that the cells from within that person's mouth would be the predominant cell structure, cell type that would be on that item."

Jimenez's medical expert was Dr. Ira Kanfer, a forensic pathologist and medical examiner. Dr. Kanfer testified that if five paper towels had been forced down a child's throat, there should have been some evidence of trauma "around the cheeks, the lips, the teeth, [or] a cut gum" because

> [t]he child's going to fight like hell. There's going to be bruises. There's going to be tears. There's going to be contusions. As well as this five rolls of paper towels, there's got—the kid has teeth, by the way, at—at two years old. I mean it's going to be ripped to shreds as well as all this associated trauma.

Kanfer explained that the absence of such evidence in this case should have been "crucial" information in the police investigation.

Kanfer opined that the blood on the paper towels was consistent with pulmonary edema, a reaction that occurs when a person is choking, cardiac arrest occurs, and the air sacs in the lungs begin filling up with water and blood. Kanfer read to the jury the results of a chest x-ray taken of B.G. several days after the incident. The results of the x-ray stated that pulmonary edema was a possibility. However, Dr. Oehring, B.G.'s treating physician in intensive care, had previously testified that B.G. did not suffer from pulmonary edema. Dr. Boulet, B.G.'s treating physician in the emergency room, also testified that he did not believe that the blood on the paper towels was consistent with pulmonary edema. This disputed testimony is significant because one of the State's

15

theories was that the blood on the paper towels resulted from the towels being forced down B.G.'s throat, while Jimenez contended that the bleeding resulted from pulmonary edema that would have occurred regardless of how the paper towels came to be lodged down B.G.'s throat.

Kanfer also disputed the characterization of the wad of paper towels as a "blood-soaked object," explaining that some of the staining may have been "gastric content" from the esophagus and that saliva and mucus also helped saturate the paper towels. Kanfer added that some of the injuries on Jimenez's hand, photographed while she was at the police station, appeared to be old scars. However, Kanfer conceded that the injury on Jimenez's thumb appeared to be recent.

Kanfer further disagreed with the State's theory that B.G. was not breathing by the time of the 911 call. Kanfer testified that the child was probably experiencing "agonal" breathing at the time, which occurs when a person is suffering from severe oxygen deprivation. According to Kanfer, while agonal breathing is not "regular" breathing, it is nonetheless a type of breathing. Kanfer also testified that when a person's airway is completely occluded, the heart could not continue beating for longer than four or five minutes and that "all purposeful movement" in the person would stop either immediately or within a minute or two. Thus, according to Kanfer, if the choking had happened much earlier than Jimenez claimed that it did (as the State maintained), the child would not have been able to bite down on Vera's or Officer Torres's fingers when they tried to look inside B.G.'s mouth. The fact that B.G. was still able to bite, in Kanfer's view, was consistent with Jimenez's claim that she had immediately rushed B.G. to her neighbor's apartment.

Kanfer also suggested that the various attempts to resuscitate B.G. and force air into his lungs may have driven the wad farther into the esophagus and further obstructed the child's

16

airway. He added that efforts to remove the obstruction from B.G.s' throat may have changed the size of the obstruction, making it appear larger than it was when it had originally gone down B.G.'s throat.

Kanfer agreed with everything in the autopsy report except for the finding that the death was a homicide. Kanfer explained that he had performed an experiment in which he wadded up five paper towels, soaked them in water, and, using his hands, was able to condense the paper towels to the point where a child could have put the paper towels in his mouth and choked on them. Kanfer testified that he could not say that B.G.'s death was a homicide within a reasonable degree of medical certainty because of the lack of evidence of injuries to the child's mouth and the fact that the paper towels were largely intact as opposed to being "shredded by the [child's] teeth."

The defense also called Dr. Randall Alexander, a board-certified pediatrician, as a "hostile witness." Dr. Alexander testified that if a child's airway is completely occluded, the child's heart would not continue to beat for an hour. Alexander also testified that pulmonary edema might or might not occur when a person's airway is blocked, and that the existence of pulmonary edema depends on more factors "than just an object being there." On cross-examination, Alexander's testimony was largely consistent with the testimony of the State's medical experts, and he agreed with most of the testimony that they provided, although he did not believe that a heart could continue beating without oxygen for as long as Dr. Oehring testified that it could. Alexander thought that after 45 minutes to an hour, there could be an occasional "blip" on an EKG monitor but not a meaningful heartbeat. Alexander also testified that the wad of paper towels had not been "soaked" in blood but was "spotted" with blood. Alexander agreed with the State's medical experts that it

17

would be impossible for a child of B.G.'s age to force five paper towels down his throat or to wad them up tightly enough so that they could fit into his mouth. Alexander also testified that in order to force the wad down a child's throat, someone would have to first "immobilize" the child.

Alexander disagreed with Dr. Kanfer's opinions. Specifically, he disagreed with Kanfer's opinion that it would have been possible for B.G. to accidentally swallow such a large object. Alexander also disagreed with Kanfer's opinion that there should have been visible injuries to B.G. if paper towels had been forced down his mouth. Alexander testified that it was possible for there to be no external or internal injuries, although it was less likely that there would be no internal injuries. Alexander also testified that the blood on the paper towels was consistent with some sort of internal injury.

Alexander further disagreed with Kanfer's opinion that pulmonary edema was the source of the blood on the paper towels. Alexander explained that pulmonary edema is not immediate but "usually takes a while to develop." In fact, Alexander was not surprised that B.G.'s chest x-ray, taken three or four days after the incident, showed a possibility of pulmonary edema because "that's the time course you'd expect."

Alexander further explained that child abuse was his primary "area of interest" in his pediatric practice and that he has performed and reviewed studies on people who are likely to commit child abuse. He testified regarding the results of these studies:

> We know that males commit about 60 percent of physical abuse; females commit about 40 percent. Parents are—commit more of it than anyone else. The next two highest groups would be mom's boyfriend, and a babysitter.

18

When asked about a situation where a person has no reported history of child abuse, and whether such a person could commit a fatal act of child abuse, Alexander testified:

> We know that in our U.S. Advisory Board Report that we did on child fatalities, when we talked about child abuse, we reviewed studies on that and issued our 1995 report. We knew that 60 percent of the time there was no previous police history, no Child Protective Services history. . . .  Now, 40 percent of the time they did.  So, it can really go either way.

Alexander was also allowed to testify, without objection from defense counsel, about "the psychology behind attacking a victim's mouth":

> Well, it's basically the mouth that offends you.  So you go for the thing that makes you mad.  If someone's hand offends you, you don't go to their foot.  You . . . tend to go for the part in child abuse that . . . bothers you.  Or it's a more generalized response to a child.  So maybe a child's crying in cases where they stuff—put in their mouth that was crying [sic].
>
> . . . I suppose an older child could sass back at you, and you're going to shut them up—as opposed to just crying response [sic].  Could be a response to being bitten.  It could be a response to vomiting.  I'm going to put a cork in it to stop you.  Unique things along those kinds of lines.

Alexander further testified concerning the significance of a caregiver providing "more than one history" of how a child's injury occurred:

> [Alexander]:   It's concerning for abuse.  It's, again, not absolute proof of anything. . . .  But in accidental situations we tend not to get different histories. . . .
>
> [State]:      Okay.  And in a situation where a caregiver gives one history that she found the child lying on the floor unconscious and another history that she found the child walking toward her clutching his throat, are

19

those two different histories different enough that that would concern you?

[Alexander]: Yeah, given that kind of history, that would make me start worrying, thinking I might have to report this to the authorities to—to see if there's a child abuse situation here.

On redirect, Jimenez asked Alexander if Jimenez's explanations of the incident were "internally consistent in terms of chronology, the way things unfolded." Alexander testified that Jimenez's explanations "seemed internally consistent" even though there were "several histories." When asked to clarify what he meant, Alexander explained, "The one of him walking to her, the one of her going and seeking him and finding him on the floor. Those are different."

After Alexander, Jimenez recalled Dr. Kanfer. We have already summarized his testimony.[7] Jimenez also called several witnesses who testified to Jimenez's peaceful nature, including Jimenez's mother, who testified that her daughter is a peaceful person who is not quick to anger. Several of Jimenez's friends and a child whom Jimenez had cared for also testified that Jimenez was peaceful and a good caregiver. Jimenez then rested her case.

In their closing arguments, the State and Jimenez summarized their respective theories of the case. Jimenez's theory was that the entire incident was an accident. B.G. liked to play with paper towels and put things in his mouth. On the day in question, he put the paper towels in his mouth and accidentally swallowed them. Jimenez discovered B.G. choking, tried to help him in the bathroom (thus explaining the blood found there), and when she was unable to do so,

---

[7] During this testimony, the State and Dr. Kanfer had exchanges that are one of the subjects of Jimenez's prosecutorial misconduct issue. We discuss these exchanges below.

immediately carried him to her neighbor's apartment. Jimenez found support in the fact that witnesses who had tried to look inside B.G.'s mouth had been unable to do so because B.G. kept biting their fingers. That would have been impossible, according to Jimenez, if B.G.'s airway had been occluded for a long period of time. The defense also portrayed Jimenez as a young pregnant woman who would not have been physically able to commit the crime of which she was accused. Additionally, the defense claimed that Jimenez's various explanations of the incident were largely consistent, and that any minor inconsistencies were the result of the trauma that she had just experienced and the fact that she did not have a proper understanding of the English language. Her possibly incriminating statements to Officer De Los Santos were also attributed to trauma and De Los Santos's aggressive questioning. Jimenez also argued that the State's medical experts were biased in the State's favor because of the emotional nature of the case. Finally, Jimenez argued that her expert, Dr. Kanfer, provided testimony that the blood on the paper towels was primarily the result of pulmonary edema and that if the paper towels had been forced down B.G.'s throat, there should have been evidence of injury to the child's face or mouth and evidence that the paper towels had been shredded by the child's teeth.

The State's theory was that Jimenez had forced the wad of paper towels down B.G.'s throat. The blood found on the paper towels and in Jimenez's bathroom, in the State's view, was evidence of force, not an accidental choking. The State's medical experts had testified that it was physically impossible for a 21-month-old child to place five paper towels down his throat, and that the child's gag reflex would prevent the child from accidentally swallowing such a large object. Furthermore, the State argued that Jimenez provided inconsistent explanations of how she found the

21

child and that her statements to Officer De Los Santos were incriminating. Additionally, the State referred to photographic evidence of what appeared to be bite marks on Jimenez's hand and Jimenez's admission to Officer De Los Santos that B.G. bit her. Based on this evidence, the State argued, "Folks, we don't need a forensic odontologist to tell you what this is on her hand."[8]

The jury convicted Jimenez of felony murder and injury to a child. Jimenez timely filed a motion for new trial. After this motion was filed, interim appellate counsel was appointed to represent Jimenez. Interim counsel filed an untimely amended motion for new trial, abandoning the issues raised in the original motion. Following a hearing, the district court denied the amended motion. This appeal followed.

## DISCUSSION

**Evidentiary sufficiency**

In her first and second points, Jimenez challenges the legal and factual sufficiency of the evidence.

When there is a challenge to the legal sufficiency of the evidence to sustain a criminal conviction, we consider whether a rational jury could have found the essential elements of the offense beyond a reasonable doubt. *Vodochodsky v. State*, 158 S.W.3d 502, 509 (Tex. Crim. App. 2005). We review all the evidence in the light most favorable to the verdict and assume that the jury

---

[8] This statement was in response to defense counsel's comment during closing, "Where is their . . . forensic orthodontist [sic]? Nowhere." Later in the argument, defense counsel added, "You [the State] won't get the forensic odontologist that you consulted and that's not in this court to testify because it ain't no bite [sic]. So stop calling it a bite. It ain't no bite [sic]." These remarks and the prosecutor's response to them will be discussed in more detail below, when we discuss Jimenez's prosecutorial misconduct and ineffective assistance of counsel issues.

resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. *See Griffin v. State*, 614 S.W.2d 155, 159 (Tex. Crim. App. 1981). It is not necessary that every fact point directly and independently to the defendant's guilt; it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances. *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993). We consider even erroneously admitted evidence. *Id.*

In a factual sufficiency review, we view the evidence in a neutral light and ask whether a jury was rationally justified in finding guilt beyond a reasonable doubt. *See Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006). We then determine whether the evidence supporting the verdict is so weak that the verdict is clearly wrong and manifestly unjust or whether the verdict is against the great weight and preponderance of the conflicting evidence. *Id.* at 415. We will not reverse a case on a factual sufficiency challenge unless we can say, with some objective basis in the record, that the great weight and preponderance of the evidence contradicts the jury's verdict. *Id.* at 417.

Under both the legal and factual sufficiency standards of review, the jury is the exclusive judge of the facts, the credibility of the witnesses, and the weight to be given to the witnesses' testimony. *Williams v. State*, No. 03-06-00039-CR, 2007 Tex. App. LEXIS 5960, at *7 (Tex. App.—Austin July 27, 2007, no pet. h.) (op., designated for publication); *Jaggers v. State*, 125 S.W.3d 661, 670 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) (citing *Penagraph v. State*, 623 S.W.2d 341, 343 (Tex. Crim. App. 1981)). Under both legal and factual sufficiency reviews, an appellate court must be appropriately deferential to the fact-finder's role at trial. *Williams*, 2007

23

Tex. App. LEXIS 5960, at *8; *Harvey v. State*, 135 S.W.3d 712, 717 (Tex. App.—Dallas 2003, no pet.) (citing *Jones v. State*, 944 S.W.2d 642, 647-48 (Tex. Crim. App. 1996)).  The jury may believe all, some, or none of any witness's testimony.  *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986); *Williams*, 2007 Tex. App. LEXIS 5960, at *8. This standard of review applies to both direct and circumstantial evidence cases.  *King v. State*, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000); *Williams*, 2007 Tex. App. LEXIS 5960, at *8.

A person commits the offense of felony murder if he or she commits or attempts to commit a felony and, in the course of and in furtherance of the commission or attempt, commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.  Tex. Penal Code Ann. § 19.02(b)(3).  A person commits the offense of injury to a child if she intentionally, knowingly, recklessly, or with criminal negligence causes serious bodily injury to a child.  *Id*. § 22.04(a)(1).  Jimenez does not dispute that placing paper towels down a child's throat is an act clearly dangerous to human life or that such an act could cause serious bodily injury to a child.  She only disputes that she committed this act.

In this case, the jury was confronted with evidence that supported two possible theories about B.G.'s death.  The State's theory was that Jimenez forced the paper towels down B.G.'s throat.  Jimenez's theory was that B.G. accidentally swallowed the paper towels.  The following evidence supports the State's theory:

- Dr. Boulet, Dr. Oehring, Dr. Peacock, and Dr. Alexander each testified that it was not possible for a 21-month-old child to accidentally swallow a wad of five paper towels.  According to their testimony, the object was too large and would not be able to bypass the child's gag reflex.  They also testified that a 21-month-old child did not have the strength or the dexterity to pack the paper towels together into a mass sufficiently tight and small to go down his own throat.

24

However, they opined that an adult could possibly "wad" the towels together and force them down the child's throat. It is undisputed that Jimenez was the only adult in the apartment when B.G. began choking.

- The wad of paper towels had blood on it. The State's medical experts testified that the presence of blood on the paper towels—whether "soaked" with blood or merely "spotted" with blood—was consistent with the State's theory that the wad was forced down B.G.'s throat.

- Jimenez made statements to Detective De Los Santos that when viewed in the light most favorable to the verdict, could reasonably have implied guilt. Jimenez stated repeatedly that she could not remember what happened and whether she put the paper towels in B.G.'s mouth. Jimenez also asked De Los Santos, "If I were to tell you that I did it, what would happen?"

- Dr. Peacock testified that she would expect a child to bite a person's fingers if that person was forcing paper towels down the child's throat. Jimenez admitted that B.G. bit her. Also, photographs of injuries to Jimenez's hand were admitted into evidence; a rational jury could infer that at least one of these injuries was a bite mark. Jimenez's own medical expert testified that one of the injuries to her hand appeared to be a fresh wound.

- Jimenez provided inconsistent explanations of how she found B.G. According to Vera's testimony, Jimenez told her that she saw B.G. walking toward her appearing to be choking, then fell to the ground. By contrast, according to Officer Torres's testimony, Jimenez told him that she had called out to B.G. and, when he did not answer her, went looking for him and found him already lying on the ground and not breathing. Dr. Alexander testified that inconsistent explanations of a child's injuries by a caregiver is a warning sign of abuse.

- The medical examiner ruled B.G.'s death a homicide. Dr. Peacock concurred with this finding and further testified that the finding of homicide "was not a close call."

- Blood consistent with B.G.'s DNA was found in Jimenez's bathroom.

- Multiple witnesses observed blood on B.G.'s mouth while he was choking. According to the State's experts, the presence of blood on B.G.'s mouth was consistent with an injury from the paper towels being forced down his throat.

The following evidence supports Jimenez's theory of the case:

- Although there was blood on B.G.'s mouth, there was no other evidence of injuries to B.G.'s mouth. According to Dr. Kanfer, if Jimenez had forced paper towels down B.G.'s throat, the

25

child would have struggled and there would have been evidence of tears, bruises, and contusions inside B.G.'s mouth. There was no such evidence.

- The wad of paper towels was largely intact when it was recovered from B.G.'s throat. Dr. Kanfer testified that if it had been forced down B.G.'s throat, it should have been "ripped to shreds."

- Jimenez's DNA was not found on the paper towels recovered from B.G.'s throat.

- A witness testified that her daughter had once choked on Kleenex when her daughter was two-years-old, which contradicted Dr. Oehring's testimony that children of B.G.'s age do not put paper in their mouths.

- B.G.'s mother testified that B.G. liked to play with objects in the kitchen, take the objects out of the kitchen, and drop them in the toilet. She also testified that B.G. liked to play with paper and once dropped an entire roll of toilet paper in the toilet. A rational jury could infer from this testimony that B.G. may have done the same thing with the paper towels and then, once they were wet, took them out of the toilet and placed them in his mouth. Jimenez's husband testified that he often observed B.G. playing with paper towels and that B.G. liked to put them in his mouth.

- Dr. Kanfer testified that the blood on the paper towels was consistent with pulmonary edema rather than the paper towels being forced down B.G.'s throat. The results of B.G.'s chest x-ray indicated that pulmonary edema was a possibility.

- Jimenez had no history of committing child abuse, and several witnesses testified that Jimenez was a peaceful person not quick to anger and a good mother who loved and took good care of children.

- When B.G. was being treated at Vera's apartment, several witnesses testified that Jimenez appeared genuinely concerned for the child's well-being. Also, during her interview with De Los Santos, Jimenez expressed love for the child, as if he were her own child.

Viewing the above evidence in the light most favorable to the verdict, we find that a rational jury could have found that Jimenez forced the wad of paper towels down B.G.'s throat. Several experts, including the pediatric emergency room doctor, the pediatric ICU doctor, a medical examiner, and a board-certified pediatrician testified that it would simply not be possible for a 21-

26

month-old child to accidentally swallow five paper towels. According to these experts, the towels would have to be forced down the child's throat by an adult, and it is undisputed that Jimenez was the only adult who was with B.G. at the time that he started choking. The jury could have rationally chosen to credit this evidence and inferred that Jimenez was the adult responsible for this act. Furthermore, the jury could have reasonably interpreted as incriminating Jimenez's inconsistent statements about how she discovered the child. Also, the jury heard evidence that B.G.'s blood was found in Jimenez's bathroom, which the jury could have reasonably concluded was the result of a struggle. Additionally, the jury heard evidence that B.G. bit Jimenez, including Jimenez's own admission of this fact to Detective De Los Santos. According to the testimony of Dr. Peacock, B.G. biting Jimenez was consistent with the State's theory that Jimenez forced the paper towels down the child's throat. The jury could have reasonably inferred from this evidence that B.G. bit Jimenez while she was forcing paper towels down his throat.

On the other hand, the jury could have rationally considered and weighed Jimenez's evidence against the State's evidence and reasonably decided to discredit Jimenez's evidence. None of the State's experts agreed with Dr. Kanfer's opinion that the blood on the paper towels was a result of pulmonary edema. Additionally, although Dr. Kanfer testified that there should have been evidence of injuries to the child's mouth if the paper towels had been forced down B.G.'s throat, Dr. Alexander disagreed, testifying that it was possible for there to be no evidence of injuries to the child's mouth. Dr. Alexander also testified that the blood on B.G.'s mouth was consistent with an injury to the mouth. Dr. Alexander disagreed with almost all of Dr. Kanfer's opinions and explained in detail the medical bases for his disagreements. The jury could have reasonably resolved the

27

conflict between Dr. Kanfer's testimony and Dr. Alexander's testimony in favor of Dr. Alexander. The jury also could have reasonably believed Dr. Alexander's testimony that in 60 percent of child abuse cases, the perpetrator has no history of committing child abuse and that babysitters are one of the "highest groups" responsible for abuse, after parents and "mom's boyfriend." Based on this testimony, the jury could have rationally chosen to discredit the character evidence that Jimenez provided in her defense. Dr. Alexander also testified about "the psychology behind attacking a victim's mouth," and that "inconsistent histories" of an event are warning signs of abuse. The jury could have reasonably inferred from this testimony that Jimenez, in a moment of anger, forced the wad of paper towels down B.G.'s throat and then attempted to cover up what she did.

Viewing the above evidence in the light most favorable to the verdict, we conclude that a rational jury could find beyond a reasonable doubt that Jimenez forced the paper towels down B.G.'s throat. Thus, there is legally sufficient evidence to support Jimenez's conviction.

We reach the same conclusion considering the above evidence in a neutral light. In a factual sufficiency review, "an appellate court must first be able to say, with some objective basis in the record, that the great weight and preponderance of the (albeit legally sufficient) evidence contradicts the jury's verdict before it is justified in exercising its appellate fact jurisdiction to order a new trial." *Watson*, 204 S.W.3d at 417. We recognize that this was a highly contested case with conflicting evidence. Nonetheless, reconciliation of any conflicts in the evidence is within the exclusive province of the jury. *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996). There is no objective basis in the record for us to conclude that the jury's resolution of the above conflicts in the evidence in favor of the State was "clearly wrong," "manifestly unjust," or "against the great

28

weight and preponderance of the evidence." *See Castillo v. State*, 221 S.W.3d 689, 693 (Tex. Crim. App. 2007) (citing *Watson*, 204 S.W.3d at 414-15, 417).

We overrule Jimenez's first and second points.

**Prosecutorial misconduct**

In her third point, Jimenez argues that she was denied due process and a fair trial because of prosecutorial misconduct throughout the proceedings. Jimenez cites 36 allegedly "snide and unprofessional" comments made by the State during the course of the trial. To preserve error in cases involving prosecutorial misconduct, the defendant must (1) make a timely and specific objection; (2) request an instruction that the jury disregard the matter improperly placed before the jury; and (3) move for a mistrial. *Cook v. State*, 858 S.W.2d 467, 473 (Tex. Crim. App. 1993). Error preservation is not required only when the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). "It is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Id*. The misconduct must deny the defendant a fair trial. *Id*. In other words, prosecutorial misconduct does "not assume constitutional dimension unless the evidence is 'so insubstantial that (in probability) but for the remarks no conviction would have occurred.'" *Guidroz v. Lynaugh*, 852 F.2d 832, 838 (5th Cir. 1988) (quoting *Edwards v. Scroggy*, 849 F.2d 204, 211 (5th Cir. 1988)).

Jimenez concedes that she made a contemporaneous objection to only one of the 36 allegedly improper comments. We will address this comment first. At some point during a break in Dr. Kanfer's testimony and outside the presence of the jury, Dr. Kanfer apparently made a rather

29

contemptuous comment about the prosecutors, which included the use of a profane verb. The State

decided to bring this comment to the jury's attention during Kanfer's cross-examination. The State

did so on three occasions. The first reference was during the following exchange:

> Q: And you're just here as a completely unbiased expert to educate the jury.
>
> A: Exactly.
>
> Q: Is that why on the break you made the statement that they, referring to Mr. Cobb and myself, could go [expletive] ourselves?
>
> A: Right. That's an exactly correct quote.

Defense counsel did not object at this point.

> The State's second reference to the comment occurred during this exchange:

> Q: Do you remember that you made the statement that Mr. Cobb and I could [expletive] ourselves before I ever asked you about money? Do you remember that?
>
> A: I don't know when I made the statement that—that you could both [expletive] yourselves, but I definitely made the statement.
>
> Q: Okay. Yeah, you definitely did.
>
> A: Yeah.
>
> Q: Is that something that you routinely do when you go out of state to testify as an expert witness?

At this point defense counsel objected to the State "getting into the personal thing any more." The

State responded that the question was relevant to the issue of Dr. Kanfer's bias. The district court

overruled the objection.

30

The State referenced the comment a third time at the end of its cross-examination of Dr. Kanfer, as the State was inquiring regarding Kanfer's disagreement with Dr. Alexander's opinions:

Q:    But you're not angry at Dr. Alexander.

A:    No, he's a nice guy.

Q:    Okay.  Well, then you don't want to tell him to go [expletive] himself.

A:    No.

Defense counsel did not object.

Jimenez objected to the State's references to Kanfer's remarks only once.  The State responded that it was attempting to show Dr. Kanfer's bias against the prosecutors, and the district court overruled the objection.  We hold that it did not abuse its discretion in doing so.  "The State is clearly entitled to show any bias a defense witness might have against the State or the prosecutor." *London v. State*, 739 S.W.2d 842, 846 (Tex. Crim. App. 1987).  The trial court has considerable discretion in determining how and when bias may be proved and what collateral evidence is material for that purpose.  *Martinez v. State*, 212 S.W.3d 411, 425 (Tex. App.—Austin 2006, pet. ref'd).  Dr. Kanfer's admitted use of profanity when referring to the prosecutors revealed potential animosity toward the prosecutors.  Furthermore, because the State referenced the remark two additional times both before and after the objected-to reference, any error would have been harmless.  *See Howard v. State*, 153 S.W.3d 382, 385 (Tex. Crim. App. 2004).

We now turn to the comments for which error was not preserved. These comments fall into four categories: (1) an alleged racist remark; (2) alleged sidebar remarks; (3) alleged mistreatment of defense witnesses; and (4) allegedly improper jury arguments and mischaracterization of evidence. After addressing each of the categories, we will then discuss Jimenez's argument that the alleged individual acts of prosecutorial misconduct, when viewed collectively, denied her a fair trial.

### *Alleged racist remark*

During its redirect examination of Detective De Los Santos, the State asked the following question regarding Jimenez: "And despite being from Mexico, she's very intelligent. Wouldn't you agree?" Jimenez characterizes this as a racist remark. However, we must consider this question in the context in which it was asked. During his previous cross-examination of De Los Santos, defense counsel had implied that because Jimenez was not from the United States, she did not understand its legal system:

Q:    I mean, this woman is not . . . from the United States, correct?

A:    That's correct.

Q:    She doesn't speak the language very well, correct?

A:    Correct.

Q:    She doesn't understand the system. . . .

A:    Correct.

Q:    She didn't know the laws. . . .

A:      Yes, sir.

Following this exchange, it is apparent that the State's question was directed to refuting the defense's suggestions that Jimenez, because of cultural or language differences, must not have understood the American legal system and had been taken advantage of by De Los Santos.  In this context, the State's question was not improper.  *See United States v. Munoz*, 150 F.3d 401, 414 (5th Cir. 1998) ("[N]o misconduct can arise from a question asked for a valid reason.").

### *Alleged sidebar remarks*

Sidebar remarks are remarks of counsel that are neither questions to the witness nor comments addressed to the court.  *Brokenberry v. State*, 853 S.W.2d 145, 152 (Tex. App.—Houston [14th Dist.] 1993, pet. ref'd).  Having examined the record and the context in which each of the alleged "sidebar" remarks was made, we have determined that while often snide or sarcastic,[9] all but one of the remarks were ultimately objections addressed to the district court or questions addressed to the witnesses:

• "Are we making speeches now, Judge, or is it time for closing arguments?"

    This statement responded to an alleged sidebar remark by defense counsel: "Just wondering how [the paper towels] got in [the child's throat]."  The prosecutor then clarified her objection:  "I guess I object to the sidebar in his speech."  The district court sustained the State's objection.

• "I know Mr. Martinez is interested in this 'Good Morning America' film that he saw on TV and all the neat things he's been able to Google search, but we're interested in legal evidence."

_____

[9] Jimenez also complains that the prosecutor's use of sarcasm deprived him of a fair trial. We discuss that contention below.

This statement or argument was made incident to a relevance objection to a request by defense counsel to show Dr. Boulet a video during cross-examination involving a child swallowing a dinner fork. Defense counsel moved on to another line of questioning without receiving a ruling from the district court.

- "Well, he could ask it ten more times and he could be ten times more sure."

   This statement occurred during an exchange concerning defense counsel's repeated questioning of De Los Santos about a probable cause affidavit. The prosecutor first objected, "Your Honor, that's been asked and answered." Defense counsel responded, "I'm just making sure, Judge." The prosecutor then made the above argument in reply. The district court commented, "We sort of let everyone do things two times." Defense counsel moved on to another line of questioning.

- "Sergeant De Los Santos pretending with a paper towel is not helpful to this jury. . . . It's just not helpful. It's not relevant. He's just—it's just a show"

- "Your Honor, I know that we're all very excited that the TV cameras are here, but this is not appropriate. . . . It's a joke."

   These statements were objections and argument in response to defense counsel asking De Los Santos to wad up some paper towels and to "shove [the wad] in [defense counsel's] mouth," pretending that defense counsel was "a kid." The district court overruled both objections and allowed the demonstration.

- "Your Honor, I object to being argumentative and making speeches. If he could just ask questions and get answers."

   This objection and argument was in response to defense counsel remarking to Dr. Oehring during cross-examination, "Well, doctor, it's in the literature, and I'm sure you've got a computer." Following the prosecutor's objection, defense counsel apologized and asked the witness a question.

- "I think Mr. Martinez is done, so you can answer the question."

   This comment was addressed to Dr. Kanfer and immediately followed the district court's overruling of a relevance objection by defense counsel to a preceding question by the prosecutor. The prosecutor followed up with the above request that the witness answer the pending question.

- "Your Honor . . . could we have this in question and answer and not lecture form, please?"

34

This statement, in substance, was an objection responding to a lengthy answer by Dr. Kanfer that takes up almost two pages of the record.

- "Well, I object on doing a hypothetical that's based on something that is not in evidence. It's not helpful to the jury if he's just making stuff up."

    This objection was in response to a proposed hypothetical by defense counsel. Defense counsel responded that the basis of the hypothetical was in evidence, and the district court overruled the objection.

- "Your Honor, I think he's said about ten times that he did not watch the video."

    In substance, this was an objection responding to defense counsel's repeatedly asking Dr. Alexander whether he had watched the videotape of De Los Santos interviewing Jimenez. Dr. Alexander had already responded that he had not. Following the objection, defense counsel moved on to another question.

- "Your Honor, I object to that. That's not based on the evidence because the defendant had many more injuries than one little nick on her thumb area."[10]

    This objection and argument responded to defense counsel's comment to De Los Santos following the demonstration involving De Los Santos attempting to stuff a wad of paper towels down defense counsel's mouth: "And so you're going to force this in his mouth without creating any injury and come out of this with just one little nick on your thumb area." The district court did not rule on the objection, and defense counsel rephrased the question.

The only alleged sidebar remark that was neither an objection addressed to the district court nor a question addressed to a witness was the following: "I'm sure [Dr. Alexander]'s not as hostile as Dr. Kanfer." This remark was in response to defense counsel's statement that he was questioning Dr. Alexander as a "hostile witness." Even if it served no legitimate purpose, we do not think that this unobjected-to remark—which merely observed what was already obvious to the jury

---

[10] Jimenez also contends that this statement was a mischaracterization of the evidence. It was not. Multiple witnesses, including Dr. Kanfer, testified that Jimenez had more than one injury on her hand.

35

regarding Dr. Kanfer's regard for the prosecutor—interfered with Jimenez's right to a fair trial. *See Darden*, 477 U.S. at 181.

### *Alleged mistreatment of defense witnesses*

Jimenez also alleges that the State asked defense witnesses Paula Salinas, Joe Martinez, and Dr. Kanfer inappropriate questions during cross-examination. The only allegedly improper question asked of Ms. Salinas was the following: "Well, I'm trying to figure out when your memory might be best. It's clear to me it's not very good. I'm not trying to pick on you, but it's not very good here in court, is it?"

Joe Martinez was a defense investigator who had been instructed to locate Dr. Paraungao, the medical examiner who performed the autopsy on B.G. During cross-examination, the State asked Martinez questions about his presence in the courtroom during the testimony of other witnesses in violation of the Rule:[11]

> Q:    You know there is a specific court rule that's so specific that we refer to it as the Rule. You're aware of that, aren't you?
>
> A:    Yes, sir.
>
> Q:    And you are aware that what the Rule is is that if a witness is testifying, other witnesses with knowledge about that matter are not allowed to be in the courtroom to hear that witness's testimony. You're aware of that, aren't you?
>
> A:    Yes, sir.

---

[11]  *See* Tex. R. Evid. 614 ("At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion.").

Q:       And you violated that rule, didn't you?

A:       I don't think so.

Q:       You are here specifically to give testimony concerning what Dr. Parangao discussed with you, correct?

A:       Yes.

Q:       And you were aware that Dr. Parangao was going to be a witness in this case?

A:       Yes.

Q:       And you were present when Dr. Parangao testified.

A:       Yes.

Q:       That's a violation of the Rule. You're aware of that, correct?

A:       The statement that was taken was taken on the weekend before he testified.

Q:       Right, but you're aware of what the Rule is, aren't you?

A:       Yes, sir.

Q:       And the Rule has nothing to do with when a statement is taken. You're aware of that.

A:       Yes.

Q:       The Rule simply says that when a witness is testifying, other witnesses, such as yourself, cannot remain in the courtroom to hear what that witness has to say. That's the Rule, isn't it?

A:       Yes, sir.

Q:       You violated the Rule, didn't you?

A:       Under that interpretation, yes.

The State asked Dr. Kanfer the following allegedly improper questions:

37

"You don't need a break to go to the bathroom, do you?" (Gratuitous reference to witness previously needing to use the restroom).

"Do you need any more help from Mr. Martinez, or can you answer the questions?"

Because defense counsel did not object to any of these questions, they are grounds for reversal only if they denied Jimenez a fair trial. *See Darden*, 477 U.S. at 181. We conclude that they did not.

Two other complaints regarding the State's treatment of Dr. Kanfer concern a comment by the State that Kanfer "seemed a little wound up" and an accusation made by Dr. Kanfer during his testimony that the State was treating him, in his words, like "a paid whore." The State never used such a term to refer to Dr. Kanfer. The State did inquire about the compensation that Dr. Kanfer was receiving for testifying, but such questions are common staples for cross-examination of paid experts in jury trials. *See Sparks v. State*, 943 S.W.2d 513, 515 (Tex. App.—Fort Worth 1997, pet. ref'd) (holding that witness may be asked questions regarding payment received for testifying). Similarly, questions concerning a witness's demeanor—another key factor bearing on a jury's perception of credibility—are not improper.

### *Improper jury argument and alleged mischaracterization of evidence*

Finally, Jimenez alleges that the State made several improper arguments to the jury during closing, including arguments that mischaracterized the evidence. A proper jury argument must fall within one of four general areas: (1) summation of the evidence, (2) reasonable deductions from the evidence, (3) answer to the argument of opposing counsel, or (4) a plea for law enforcement. *Guidry v. State*, 9 S.W.3d 133, 154 (Tex. Crim. App. 1999); *Cole v. State*, 194 S.W.3d 538, 544 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd). The State is permitted to draw

38

reasonable inferences from the evidence and is to be afforded wide latitude in its jury arguments as long as counsel's argument is supported by the evidence and in good faith. *Stewart v. State*, 995 S.W.2d 187, 190 (Tex. App.—Fort Worth 1999, pet. ref'd) (citing *Griffin v. State*, 554 S.W.2d 688, 690 (Tex. Crim. App. 1977)).

We will separately address each of the arguments alleged to have been improper. First, we find the following arguments to be proper:

- Jimenez alleges that the State improperly argued that Jimenez could be convicted of both murder and injury to a child.

  As will be explained in more detail below when discussing the alleged double jeopardy violation, this was an accurate statement of the law.

- The prosecutor attacked the credibility of Dr. Kanfer during her closing: "I don't have anything personal to say about Dr. Kanfer. I mean . . . the way he approaches his work is not my style. I don't really admire that. That's not the way I do business. That's not the way my expert witnesses do business. But we see all kinds of people in the courtroom, and we need to really set aside the personal—personalities and listen to the evidence and listen to what rings true."

  This comment was merely a summation of the evidence elicited during the State's cross-examination of Dr. Kanfer, during which the State attacked Dr. Kanfer's qualifications, methodology, and neutrality.

- The prosecutor argued that Dr. Kanfer "was teaching people how to make a homicide scene look like an accident."

  This argument was in response to Dr. Kanfer's admission during cross-examination that he had published an abstract entitled, "How to turn a homicide into an accident." Jimenez alleges that the prosecutor took the title of the abstract out of context. However, Dr. Kanfer never explained the subject matter of the abstract. Therefore, the prosecutor's remark was a reasonable deduction from the evidence.

- The prosecutor argued that "agonal breathing" was not "breathing."

  Although this argument conflicted with the testimony of Dr. Kanfer, it was consistent with the testimony of the 911 dispatcher who testified that laypersons often mistake

"agonal respirations" for "true breathing." Therefore, the prosecutor's remark was consistent with the evidence presented by the State.

- The prosecutor argued that Jimenez's neighbor Paula Salinas turned off Jimenez's oven before the officers arrived at the scene.

  Although this argument conflicts with the testimony of Officer Larry Biegert, who testified that the oven was still on when he accompanied Jimenez and Officer Torres into the apartment, it is consistent with the testimony of Detective Walker, who testified that Salinas told him that she had turned off the stove prior to the arrival of the police. The prosecutor acknowledged the conflicting testimony, and we find nothing improper about the prosecutor asking the jury to resolve the conflicting evidence in favor of the State's theory of the case.

- Jimenez alleges that at one point the prosecutor argued that Jimenez admitted putting her "whole hand" into B.G.'s mouth.

  In actuality, the prosecutor argued that Jimenez told Detective De Los Santos, "Well, I checked his mouth. I didn't see anything, didn't feel anything." We find this to be an accurate summary of Jimenez's statements to Detective De Los Santos during her interview.

- The prosecutor argued that Jimenez cleaned up her apartment prior to the arrival of the police.

  This was a reasonable deduction from the evidence. Witnesses testified that Jimenez returned to her apartment on at least two occasions after bringing B.G. to Vera's apartment. Detective Walker testified that the bottom of the blood-smeared bathtub was wet when he searched Jimenez's apartment, which could suggest an effort by Jimenez to clean up the bathroom.

- Jimenez alleges that at one point one of the prosecutors injected his "personal belief" into the argument.

  Jimenez does not identify which specific comment she found objectionable and we can find no impermissible comment on the page to which Jimenez cites.

- Finally, Jimenez alleges that the State mischaracterized the injuries on Jimenez's hand as bite marks.[12]

---

[12] Jimenez alleges that the State employed a forensic odontologist "who apparently did not confirm that the scars on Appellant's hand were fresh bite marks." As will be discussed in more detail below when discussing Jimenez's ineffective assistance of counsel issue, this allegation is not

This was not a mischaracterization of the evidence. Jimenez admitted to Detective De Los Santos that B.G. bit her. There was also a photograph of Jimenez's hand admitted into evidence which showed what appeared to be a bite mark on Jimenez's thumb. Thus, calling the injuries bite marks was a reasonable deduction from the evidence.

We find the following arguments to be improper:

- Jimenez alleges that the State struck at Jimenez over the shoulders of her defense counsel by commenting that Mr. Martinez "yelled at the top of his lungs, 'This is not a bite mark,'" and by earlier contrasting her approach to closing argument to defense counsel's: "I have not a real emotional approach to guilt / innocence. I'm not going to scream at you. I'm not going to wave my arms. I'm not going to call people names."

  "Although it is impossible to articulate a precise rule regarding these kinds of arguments, it is fair to say that a prosecutor runs a risk of improperly striking at a defendant over the shoulder of counsel when the argument is made in terms of defense counsel personally and when the argument explicitly impugns defense counsel's character." *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998). Because the prosecutor's argument criticized defense counsel personally, we will assume that it was improper. *See id*.

- The prosecutor referred to Officer Torres as the officer "who Mr. Martinez loved."

  This reference was in response to the following statement by defense counsel in his closing argument: "Poor Torres. I love that cop. I love that cop. Because he's not a spinner. He's got no axe to grind with anybody." The prosecutor's reference to defense counsel's comment had nothing to do with the evidence presented at trial.

- The prosecutor argued that there was "fresh" blood on the pillow in Jimenez's bedroom.

  Detective Walker testified that he found what appeared to be *dried* blood on the sheet and a pillowcase in the bedroom. Detective Walker never testified that the blood was fresh. Thus, the prosecutor's remark was not a reasonable deduction from the evidence.

---

supported in the record.

- The prosecutor argued that there was a "fingerprint shape" in the blood smear on the bathtub.

   The State asserts that this was a reasonable deduction from Detective Walker's testimony that a blood smear occurs when a person gets blood on his hands and transfers it to another surface and from the pictures of the blood smear that were admitted into evidence. We disagree. There were no fingerprints obtained from the bathtub, and implying that the smear was "fingerprint shaped" was not a reasonable deduction.

- The prosecutor argued that she personally attempted to stuff five paper towels into her own mouth and that "it was not a pretty sight."

   This argument was in response to defense counsel's suggestion during closing that the State was "lazy" in its efforts to uncover the truth about what happened. The prosecutor's attempt to stuff paper towels into her mouth was not admitted into evidence and it was thus improper for her to comment on it during her closing argument.

Improper jury argument is reversible error when it (1) violates a statute, (2) injects new and harmful facts into the case, or (3) is manifestly improper, harmful, and prejudicial to the rights of the accused. *Wilson v. State*, 938 S.W.2d 57, 59 (Tex. Crim. App. 1996); *Lee v. State*, 51 S.W.3d 365, 371 (Tex. App.—Austin 2001, no pet.). However, "a defendant's failure to object to a jury argument or a defendant's failure to pursue to an adverse ruling his objection to a jury argument *forfeits* his right to complain about the argument on appeal." *Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996) (emphasis added). Jimenez concedes that she failed to object to any of the above arguments. Thus, Jimenez failed to preserve error for review. *See* Tex. R. App. P. 33.1(a).

Furthermore, improper jury argument has been held to be non-constitutional error. *See Mosely v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998). Non-constitutional error that does not affect substantial rights must be disregarded. *See* Tex. R. App. P. 44.2(b). In determining

whether improper jury argument affected a defendant's substantial rights, courts examine three factors: (1) the severity of the misconduct (the magnitude of the prejudicial effect of the prosecutor's remarks), (2) the measures adopted to cure the misconduct (the efficacy of any cautionary instruction by the judge), and (3) the certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction). *Mosely*, 983 S.W.2d at 259.

The prosecutor's comments about defense counsel did not accuse counsel of insincerity or bad-faith conduct, which is usually what qualifies as "striking over the shoulder" of defense counsel. *See Fuentes v. State*, 664 S.W.2d 333, 335 (Tex. Crim. App. 1984). The characterization of the blood on the pillowcase as being "fresh" and the argument about the blood smear on the bathtub being "fingerprint shaped," although improper characterizations, were likely rendered harmless in light of the fact that the majority of the State's argument focused on the blood that was actually tested for DNA and was consistent with B.G.'s DNA profile. Finally, the prosecutor's comment about her own attempt to stuff paper towels into her mouth did not inject new or harmful facts into the case, as there was already evidence in the record about people attempting to put paper towels down their mouths. Dr. Kanfer, in particular, testified to his own experiments in which he determined that this was possible. Also, defense counsel asked Detective De Los Santos to wad paper towels together and attempt to force them into defense counsel's mouth, and the district court allowed this demonstration.

There were no cautionary instructions to disregard the improper arguments because defense counsel did not object. However, the third factor weighs against reversal because, as we

have already discussed, there was sufficient evidence supporting the conviction. We conclude that any error in allowing the improper arguments, even if it had been preserved, was harmless.

### Collective impact of the misconduct

In summary, with but one exception, the alleged prosecutorial misconduct of which Jimenez complains was not objected to by defense counsel. Thus, in order for the misconduct to result in reversal, it must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181. Jimenez argues that the State was "out of control" throughout the proceedings and that the various acts of misconduct described above, considered collectively, denied her due process and a fair trial. In particular, Jimenez complains of "heavy" sarcasm allegedly displayed by one of prosecutors throughout the trial. We agree that the prosecutor injected sarcasm into some of her objections, her closing argument, and her questioning of Dr. Kanfer. However, we do not agree with Jimenez's claim that the prosecutor's sarcasm in this case entitles her to a new trial.

Jimenez cites two cases in which sarcasm has been called "unprofessional" and "completely out of place." *See United States v. Diaz-Carreon*, 915 F.2d 951, 957 n.10 (5th Cir. 1990); *Von Burleson v. State*, 505 S.W.2d 553, 555 (Tex. Crim. App. 1974). The characterization of sarcasm as "unprofessional" and "completely out of place" in these cases reflected the context in which the sarcasm was displayed. In *Diaz-Carreon*, the prosecutor "used a sarcastic tone of voice [during closing] when he stated the jury might disbelieve the Government's witnesses." 915 F.2d at 957 n.10. The court called this behavior "admittedly unprofessional." *Id*. In *Von Burleson*, during the defendant's testimony, the defendant testified, "They messing with you

44

all the time out there if you have got a record." 505 S.W.2d at 555. In response, the prosecutor remarked, "In your case that's well justified." *Id*. The court characterized this remark as "low-keyed sarcasm," and called it "completely out of place." *Id*. In neither case, however, did the court find the sarcasm to be "inflammatory" and, thus, grounds for reversal. *See id*.; *Diaz-Carreon*, 915 F.2d at 957.

Jimenez cites only one case in which a prosecutor's sarcasm resulted in reversal. *See McKenzie v. State*, 617 S.W.2d 211 (Tex. Crim. App. 1981). However, in *McKenzie*, the prosecutor's sarcasm was directed toward the defendant's character: "The prosecutor was engaging in heavy sarcasm, making appellant out as a pariah—a person deservedly shunned by his minister, his old college classmate, his neighbors and parents of small children, though there was no evidence whatsoever to support the branding." *Id*. at 221. In addition, the court emphasized that the sarcasm was particularly damaging because the proof of defendant's guilt was "meager though sufficient." *Id*. In contrast to *McKenzie*, the prosecutor's sarcasm in this case was not directed at the defendant personally, and the evidence of Jimenez's guilt was certainly not "meager."

We disagree with Jimenez's claim that the prosecutor engaged in "heavy" sarcasm throughout the trial akin to the sarcasm condemned in *McKenzie*. We have reviewed the entire record; thus, we are aware of the prosecutor's conduct throughout the trial, not just during the isolated incidents of which Jimenez complains. The prosecutor's conduct did not rise to a level that it "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. 181. Again, because she did not object to the prosecutorial misconduct, Jimenez bears the heavy burden of demonstrating that the evidence was "so insubstantial that (in probability)

45

but for the [misconduct] no conviction would have occurred." *Lynaugh*, 852 F.2d at 838. Based on our review of the evidence, we conclude that Jimenez has not satisfied this burden. We overrule Jimenez's third point.

**Ineffective assistance of counsel**

In her fourth point, Jimenez claims that she was denied effective assistance of counsel when her interim appellate attorney filed an amended motion for new trial and elected not to proceed on the issues presented in the original motion for new trial.

The original motion for new trial was timely filed on September 29, 2005, within thirty days of the judgment of conviction. *See* Tex. R. App. P. 21.4(b). According to Jimenez, the most important allegation in this motion was that the State

> [s]olicited from a police officer that [Jimenez's] forefinger had bite marks, and argued to the jury that the Defendant had bite marks, but the State knew those marks were not bite marks but hyper-pigmentation from an old burn. That was the reason [the State's] dental expert was not called, and no medical expert was asked to identify these marks. The defense pathologist was not even cross-examined on the issue because the prosecution knew they were not bite marks, and defense expert also stated that these were not bite marks.

Jimenez was granted a hearing on the motion, which was consistent with a conclusion by the district court that one of the claims alleged in the motion, if true, could entitle Jimenez to a new trial. *See Reyes v. State*, 849 S.W.2d 812, 815 (Tex. Crim. App. 1993) (holding that "when an accused presents a motion for new trial raising matters not determinable from the record, upon which the accused could be entitled to relief, the trial judge abuses his discretion in failing to hold a hearing.").

While this new-trial motion was pending, the attorney who filed it withdrew. On

October 19, 2005, interim appellate counsel was appointed to represent Jimenez. Interim counsel filed an amended motion for new trial on October 28, 2005, more than thirty days after the judgment of conviction. At the hearing on the motion for new trial, counsel argued that the district court had discretion to allow the amended motion. After a lengthy debate between the State and defense counsel on the merits of this argument, the district court sustained the State's objection to the amended motion. Defense counsel then proceeded to introduce evidence of the claims alleged in the amended motion, which the district court allowed in the form of a bill of exceptions. Defense counsel informed the district court that they had "jettisoned a number of claims" in the original motion that in their "opinion were not meritorious." Following the hearing, the district court denied the motion for new trial.

Jimenez's argument on appeal is as follows: "Appellant had claims in her original motion for new trial that, if true, would have entitled her to relief, and was prejudiced by waiver of those claims, for which there was no strategic reason." Thus, we must determine whether counsel's decision to not argue the claims in the original motion for new trial constituted ineffective assistance of counsel. We begin with the two-pronged analysis in *Strickland v. Washington*, 466 U.S. 668 (1984).[13] Pursuant to *Strickland*, Jimenez must demonstrate (1) that her counsel's performance was

_____

[13] Citing *Vasquez v. State*, 830 S.W.2d 948 (Tex. Crim. App. 1992), Jimenez asserted during argument that because counsel's actions were "per se unreasonable," the analysis in *Strickland* does not apply to this case. However, the court in *Vasquez* did, in fact, apply the two-pronged *Strickland* analysis. *See id*. at 949. The only time that the *Strickland* analysis does not apply is when prejudice is "presumed." *See United States v. Cronic*, 466 U.S. 648, 659 (1984). Prejudice is presumed "only when the defendant demonstrates that counsel was not merely incompetent but inert, distinguishing shoddy representation from no representation at all." *Gochicoa v. Johnson*, 238 F.3d 278, 284 (5th Cir. 2000). "When the defendant complains of errors, omissions, or strategic blunders, prejudice is not presumed; bad lawyering, regardless of how bad, does not support the per se presumption of prejudice." *Id*. at 284-85. Jimenez alleges errors, omissions, or strategic blunders in counsel's

deficient, i.e., it fell below an objective standard of reasonableness, and (2) that Jimenez was prejudiced by the deficient performance, i.e., a reasonable probability exists that, but for the deficient performance, the result of the proceeding would have been different. 466 U.S. at 687-88, 694; *Ex parte Cash*, 178 S.W.3d 816, 818 (Tex. Crim. App. 2005).

### *Deficient performance*

In reviewing an ineffective assistance of counsel claim, we indulge a strong presumption that counsel was competent. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). Appellant bears the burden of proving by a preponderance of the evidence that counsel was ineffective. *Id*. Any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Id*. at 813; *see also Janecka v. State*, 937 S.W.2d 456, 476 (Tex. Crim. App. 1996) (appellate court may not consider on direct appeal any factual assertions that are outside the record). If counsel's reasons for his conduct do not appear in the record and there is at least the possibility that the conduct could have been legitimate trial strategy, we will defer to counsel's decisions and deny relief on direct appeal. *Ortiz v. State*, 93 S.W.3d 79, 89 (Tex. Crim. App. 2002). In most instances, the record on direct appeal is inadequate to develop an ineffective assistance claim. *Ex parte Torres*, 943 S.W.2d 469, 475 (Tex. Crim. App. 1997). Moreover, the record ordinarily does not reflect counsel's reasons for doing or failing to do actions of which the defendant complains. *Id*. Hence, in most ineffective assistance claims, a writ of habeas corpus is essential to gathering the facts necessary to adequately evaluate such claims. *Id*.

---

representation. Therefore, this is not the type of case in which we may presume prejudice. *See id*.

In this case in particular, we cannot evaluate the reasons for counsel's actions without an evidentiary hearing. Jimenez raised a claim in her original motion for new trial that, *if true*, would potentially entitle her to a new trial. A key piece of evidence in the State's case was the alleged bite mark. If the State had in its possession evidence from a forensic odontologist that this was not necessarily a bite mark, decided to withhold this evidence, and then took a position during trial that was contrary to this evidence, these actions would have implicated Jimenez's right to a fair trial. *See Giglio v. United States*, 405 U.S. 150, 153 (1972) (holding that "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice."); *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (holding that "a conviction obtained through use of false evidence" violates due process, as does a conviction obtained "when the State, although not soliciting false evidence, allows it to go uncorrected when it appears."). *If this claim was true*, counsel would have been deficient in abandoning it because no reasonably competent defense attorney would abandon a winning claim that would result in a new trial for his client. *See Giglio*, 405 U.S. at 155 (holding that remedy for *Napue* violation is reversal of conviction and remand for new trial). On the other hand, if this claim was not true, or if there was simply insufficient evidence to support the claim, then counsel would not have been deficient in abandoning it. Thus, an evidentiary hearing on counsel's performance would have allowed Jimenez the opportunity to submit evidence of why she believed that the claim had merit, allowed interim counsel the opportunity to submit evidence of why they believed otherwise, and allowed the district court the opportunity to examine the evidence submitted and determine which side was correct. The losing side would likely have appealed the district court's decision, and this Court would then have had an opportunity to examine the evidence on which the district court relied. But on direct appeal, in the

49

absence of any evidence to examine, we simply have no basis to conclude that counsel's representation was deficient. To hold that the representation by Jimenez's counsel was deficient without a proper record exploring the basis for counsel's decision to abandon the original motion would require this court to speculate as to counsel's motivation and reasoning, which we may not do. *See De Los Santos v. State*, 219 S.W.3d 71, 75 (Tex. App.—San Antonio 2006, no pet.).

However, Jimenez argues that she had already been granted an evidentiary hearing on this claim, but that counsel, by abandoning the claim, effectively denied Jimenez her right to the hearing. Again, we do not know the specific reasons for counsel's decision to abandon the claim. However, we do know that, during the hearing, counsel characterized the abandoned claims as "not meritorious." Such a statement suggests that counsel evaluated the claim prior to the hearing and made a judgment call that it would not succeed on the merits. On this record, we are not in a position to second-guess counsel's decision.

Jimenez also claims that counsel was deficient in attempting to proceed on an amended motion for new trial that had been filed more than 30 days after the judgment of conviction. Jimenez argues that this decision was "per se unreasonable" because no reasonably competent defense attorney would have engaged in this conduct for any reason. *See Mata v. State*, 226 S.W.3d 425, 2007 Tex. Crim. App. LEXIS 695, at *6 (Tex. Crim. App. June 6, 2007) (citing *Vasquez v. State*, 830 S.W.2d 948, 951 (Tex. Cr. App. 1992)). We disagree. Assuming that counsel made a determination prior to the hearing that the claims in the original motion were not meritorious, counsel was faced with the following dilemma: argue a timely filed motion to the district court that

counsel did not believe would succeed on the merits, or file an untimely amended motion for new trial containing claims that counsel believed were meritorious.[14]

Given those options, counsel's decision to proceed with the untimely amended motion was not per se unreasonable. At the hearing, counsel argued that the district court had discretion to consider the untimely motion. Although the court of criminal appeals recently held otherwise, *see State v. Moore*, 225 S.W.3d 556, 2007 Tex. Crim. App. LEXIS 696, at *6 (Tex. Crim. App. 2007), at the time of the hearing on the motion for new trial, we do not think that this was an unreasonable argument. Rule of appellate procedure 21.4 provides that "[w]ithin 30 days after the date when the trial court imposes or suspends sentence in open court but before the court overrules any preceding motion for new trial, a defendant may, *without leave of court*, file one or more amended motions for new trial." Tex. R. App. P. 21.4(b) (emphasis added). We do not think that it was unreasonable for counsel to infer from this language that after the 30 days have expired, a defendant may file an amended motion for new trial *with* leave of court. In other words, we think that a legitimate argument could have been made, prior to *Moore*, that the trial court has discretion to allow a defendant to file an amended motion after the 30-day deadline.[15] Furthermore, counsel's position

---

[14] Jimenez asserts that the claims in the amended motion for new trial were not meritorious. However, without a record explaining the reasons for counsel's decision to argue these claims, we are not in a position to declare counsel's performance deficient simply because Jimenez now believes that the claims may not have ultimately succeeded. Jimenez also asserts that the amended motion was deficient in that it was not sworn or supported by affidavit. However, the requirement that a motion for new trial be supported by affidavit "is applicable only to cases where the motion is grounded on matters that are not already a part of the case record." *Bahm v. State*, 219 S.W.3d 391, 395 (Tex. Crim. App. 2007). As Jimenez concedes in her brief, the amended motion "challenged only record claims."

[15] We note that this interpretation of the rule was contrary to then-existing precedent. *See, e.g.*, *Mercier v. State*, 96 S.W.3d 560, 562 (Tex. App.—Fort Worth 2002, no pet.); *Flores v. State*,

was strengthened by the equitable consideration that they had not been appointed to represent Jimenez until after the 30 days had already expired. Thus, interim counsel did not have an opportunity to timely file an amended motion.

On this record, we cannot conclude that interim counsel's performance was deficient.

### *Prejudice*

Furthermore, Jimenez must also prove prejudice, i.e., that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 694. As an initial matter, we must determine the proper focus of our inquiry. The State argues that we should consider whether the motion for new trial would have been granted but for counsel's deficient performance. Jimenez asserts, in a supplemental brief filed with this Court following oral argument, that the focus should be "not on whether [she] would have won or lost at the motion for new trial hearing, but on whether, but for trial counsel's error, [she] would have had the hearing she was entitled to under *Reyes*." *See* 849 S.W.2d at 216. In other words, according to Jimenez, she "does not have to prove that *any* of the claims raised in her motion for new trial would ultimately have succeeded in order to entitled to relief." All she needs to show is that the district court would have *heard* her claims had counsel not abandoned them.

We are aware of no authority, and Jimenez cites no authority, that would allow us to sustain a claim of ineffective assistance of counsel based merely on a showing that the district court

18 S.W.3d 796, 798 (Tex. App.—Austin 2000, no pet.). However, the court of criminal appeals had not yet addressed this specific issue, and at the time the amended motion was filed, a case was pending in the United States Supreme Court on a similar issue involving the federal rules. *See Eberhart v. United States*, 546 U.S.12, 19-20 (2005) (holding that although federal rule on deadline for filing motion for new trial is "inflexible," government may "forfeit" timeliness defense by not raising it prior to consideration of motion's merits).

would have heard the defendant's claims.  In fact, Jimenez's position seems contrary to the express language in *Strickland* holding that courts are to focus on the "result" and the "outcome" of the proceeding, whatever that proceeding may be.  *See* 466 U.S. at 694 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the *result* of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the *outcome*." (emphases added)).[16]  The State's position, on the other hand, is consistent with both *Strickland* and Texas precedent.  *See, e.g.*, *Redmond v. State*, 30 S.W.3d 692, 699 (Tex. App.—Beaumont 2000, pet. ref'd) (holding that defendant "failed to establish prejudice by demonstrating that the motion for new trial would have been granted had the trial court conducted the evidentiary hearing."); *Bacey v. State*, 990 S.W.2d 319, 334 (Tex. App.—Texarkana 1999, no pet.) (no prejudice shown from counsel's failure to timely obtain hearing on motion for new trial); *Bryant v. State*, 974 S.W.2d 395, 400 (Tex. App.—San Antonio 1998, pet. ref'd) (no prejudice shown from counsel's failure to file motion for new trial).  Therefore, we agree with the State that in order to show prejudice, Jimenez must demonstrate that there is a reasonable probability that, but for counsel's alleged unprofessional errors, the district court would have granted Jimenez a new trial.

Jimenez failed to make this showing.  In cases of suppression or nondisclosure of evidence by the State, the standard for determining whether to grant a new trial is whether the evidence "may have had an effect on the outcome of the trial."  *See Napue*, 360 U.S. at 272; *Graham*

---

[16] Citing *Hill v. Lockhart*, 474 U.S. 52 (1985), Jimenez argues in her supplemental brief that prejudice means "different things in different situations."  *See id*. at 59 (holding that in *Strickland* cases involving guilty pleas, "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.").  However, even *Hill* concerned an outcome.  Pleading guilty produces a different outcome than pleading not guilty—not going to trial versus going to trial.

*v. State*, 486 S.W.2d 92, 96 (Tex. Crim. App. 1972). There is no indication in the record that an odontologist's report favorable to Jimenez existed. The only evidence that Jimenez cites in the record to support her claim is State's Exhibit 103, the affidavit for the search warrant of Jimenez's person. In the affidavit, the affiant makes the following statement: "Det. W.E. Harrison advised affiant that a Dentist trained in forensic ondontology was consulted to analyze the bite mark on the finger of Jimenez. The Dentist requires ultraviolet photographs of the bite mark to perform the requested analysis." This does not indicate that the analysis was actually performed or, if it was, what the results of that analysis were. On this record, we cannot say that the evidence cited by Jimenez may have had an effect on the outcome of the trial. Therefore, there is not a reasonable probability that, even if counsel had pursued Jimenez's *Napue* claim, she would have been granted a new trial.[17] We overrule Jimenez's fourth point of error.

**Double jeopardy**

In her fifth point, Jimenez asserts that her convictions for both felony murder and injury to a child violated her Fifth Amendment[18] protection against double jeopardy because both offenses arose out of the same criminal episode.[19]

---

[17] We again note that if, as Jimenez alleges, there is evidence outside the record that the State suppressed material evidence, she should raise her ineffective assistance of counsel claim in a petition for writ of habeas corpus.

[18] Jimenez also alleges violations of the Texas Constitution and the code of criminal procedure. *See* Tex. Const. art. I, § 14; Tex. Code Crim. Proc. Ann. art. 1.10 (West 2005). However, she does not argue that the protection against double jeopardy under Texas law is any different than the protection afforded under federal law. Therefore, we overrule any arguments under these provisions as inadequately briefed. *See Russeau v. State*, 171 S.W.3d 871, 881 (Tex. Crim. App. 2005) (citing Tex. R. App. P. 38.1(h)).

[19] It does not appear from the record that Jimenez preserved her double jeopardy objection at or before the time that the charge was submitted to the jury. However, a double jeopardy claim

The Fifth Amendment guarantee against double jeopardy protects against: (1) a second prosecution for the same offense following conviction; (2) a second prosecution for the same offense following acquittal; and (3) multiple punishments for the same offense. *Illinois v. Vitale*, 447 U.S. 410, 415 (1980); *Cervantes v. State*, 815 S.W.2d 569, 572 (Tex. Crim. App. 1991); *Williams*, 2007 Tex. App. LEXIS 5960, at *12. When the same act or transaction violates two different penal statutes, the two offenses are the same for double-jeopardy purposes if one of the offenses contains all the elements of the other. *Blockburger v. United States*, 284 U.S. 299, 304 (1932). Cumulative punishment may be imposed where separate offenses occur in the same transaction, as long as each conviction requires proof of an additional element that the other does not. *Id.*; *Phillips v. State*, 787 S.W.2d 391, 394 (Tex. Crim. App. 1990). Absent indication of contrary legislative intent, it is presumed that the legislature did not intend to authorize multiple punishments for two offenses that are the same under the *Blockburger* test. *Whalen v. United States*, 445 U.S. 684, 691-92 (1980); *Duvall v. State*, 59 S.W.3d 773, 780 (Tex. App.—Austin 2001, pet. ref'd).

However, the Double Jeopardy Clause does not impose a limitation on the legislative prerogative to prescribe the scope of punishment. *Missouri v. Hunter*, 459 U.S. 359, 368 (1983);

---

may be raised for the first time on appeal if the violation is clearly apparent on the face of the record and when enforcement of the usual rules of procedural default would serve no legitimate state interests. *Gonzalez v. State*, 8 S.W.3d 640, 643 (Tex. Crim. App. 2000). Because it is undisputed that the two convictions in this case are based on the same conduct, if there is a double jeopardy violation it is clearly apparent on the face of the record. *Johnson v. State*, 208 S.W.3d 478, 510 (Tex. App.—Austin 2006, pet. ref'd). Furthermore, because both convictions arose out of the same trial, enforcement of the usual rules of procedural default would serve no legitimate state interest. *Id*. Therefore, Jimenez may raise her double jeopardy claim for the first time on appeal.

*Ex parte Kopecky*, 821 S.W.2d 957, 958-59 (Tex. Crim. App. 1992); *Johnson v. State*, 208 S.W.3d 478, 510 (Tex. App.—Austin 2006, pet. ref'd). A defendant suffers multiple punishments in violation of the Fifth Amendment only when she is convicted of more offenses than the legislature intended. *Ex parte Ervin*, 991 S.W.2d 804, 807 (Tex. Crim. App. 1999). When a legislature specifically authorizes multiple punishments under two statutes, even if those two statutes proscribe the "same" conduct, "a court's task of statutory construction is at an end and the prosecutor may seek and the trial court or jury may impose cumulative punishment under such statutes in a single trial." *Hunter*, 459 U.S. at 368-69; *Johnson*, 208 S.W.3d at 511.

The injury-to-a-child statute provides:

> A person who is subject to prosecution under both this section and another section of this code may be prosecuted under either or both sections. Section 3.04 [mandatory severance] does not apply to criminal episodes prosecuted under both this section and another section of this code. If a criminal episode is prosecuted under both this section and another section of this code and sentences are assessed for convictions under both sections, the sentences shall run concurrently.

Tex. Penal Code Ann. § 22.04(h).

This Court has previously held that "[t]his statute plainly authorizes multiple punishments when a defendant's conduct violates both section 22.04 and another penal code section." *Johnson*, 208 S.W.3d at 511.

We overrule Jimenez's fifth point of error.

56

## CONCLUSION

We affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Justices Puryear, Pemberton and Waldrop

Affirmed

Filed:   August 31, 2007

Publish