# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00334-CR

**Estanislado Ovalle Jr., Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF COMAL COUNTY, 207TH JUDICIAL DISTRICT
### NO. CR2007-125, HONORABLE CHARLES R. RAMSAY, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury found appellant Estanislado Ovalle, Jr. guilty of first degree arson, *see* Tex. Penal Code Ann. § 28.02 (West Supp. 2008), third degree arson, *see id.*, and cruelty to animals, *see* Act of May 24, 2001, 77th Leg., R.S., ch. 450, § 1, 2001 Tex. Gen. Laws 887 (amended 2007) (current version at Tex. Penal Code Ann. § 42.092 (West Supp. 2008)). The jury assessed punishment at twenty years' imprisonment and a $10,000 fine for the first-degree-arson charge, ten years' imprisonment and a $5,000 fine for the third-degree-arson charge, and two years' imprisonment for the cruelty-to-animals charge. Ovalle raises four points of error on appeal, arguing that the double jeopardy clauses of the federal and state constitutions bar his convictions for third degree arson and cruelty to animals, that the evidence is legally and factually insufficient to support his conviction for cruelty to animals, and that the evidence is legally insufficient to support his conviction for first degree arson. Because we hold that the double jeopardy clause bars

Ovalle's conviction for third degree arson, we set aside that conviction. Having found no other error, we affirm the judgments of conviction for first degree arson and cruelty to animals.

**BACKGROUND**

*The Fire*

Around 5:30 a.m. on May 25, 2006, Ovalle knocked on his neighbors' door, told them his house was on fire, and asked them to call 911. Ovalle's neighbor, Gary Ebert, testified that he quickly got dressed and went outside while his wife called 911. According to Ebert, "there was smoke everywhere" and, as he neared Ovalle's house, he could see the flames inside. Ebert testified that Ovalle was in the backyard, using a water hose to try to fight the fire, but the fire was already out of control. Ebert tried to get Ovalle to leave the backyard, but Ovalle resisted and kept calling for his wife, Lana Ovalle.[1] Ebert noticed that Lana's car was not in the driveway, guessed that she was not in the home, and convinced Ovalle to retreat to safety.

Firefighters from the New Braunfels Fire Department arrived on the scene shortly thereafter. Firefighter Jeremy Van Ausdall testified that the entire street was covered with so much smoke that "it was initially hard to pin down exactly which house" was on fire. Once they had parked in front of Ovalle's home, Van Ausdall and another firefighter, Omar Mercado, suited up and forced entry into the home through the locked front door. According to Van Ausdall, the fire was rolling over their heads through the attic and the majority of the ceiling had already fallen from the fire. The men began suppressing the fire that was in the kitchen and dining area, not far from the

---

[1] Because Lana Ovalle shares the same surname as the appellant in this case, we will refer to her as Lana.

front door, working their way to the hall bathroom, where "the bulk of the heat was originating." Van Ausdall testified that there was women's clothing piled in the bathtub, where it appeared that the fire had originated. He also testified that, once they made their way into the bedroom, he saw jewelry and make-up strewn across the bedroom floor. Van Ausdall testified that there was no evidence of anyone having tried to put the fire out from inside the home before the firefighters arrived.

The second firefighting crew to enter the home, led by Jason Wallace, began a search and rescue mission for Lana—who they were told might or might not be in the building—and the family dog, Poopers, while the first crew continued the fire suppression efforts. Wallace testified that the smoke hampered their visibility and that they "couldn't really walk around because the heat was too high, so we were crawling on our hands and knees." The firefighters worked their way from the right side of the house to the left side, checking every room for Lana and Poopers. When they reached the master bedroom, Wallace found Poopers lying on his side between the bed and the wall, next to a dresser, his teeth clenched onto the leg of the dresser. Wallace got the dog loose from the dresser and removed him from the home. After he was removed, Poopers was pronounced dead from smoke inhalation.

*The Investigations*

The next people to arrive on the scene were the arson investigators, led by Comal County Fire Marshal Darren Brinkkoeter. Brinkkoeter testified that the firefighters were still actively fighting the fire when he arrived, so he donned protective gear for his initial inspection of the home. Brinkkoeter testified that he saw extensive heat damage throughout the home, with the

hall bathroom having sustained the most extensive damage, plus smoke damage in the master and spare bedrooms. Brinkkoeter noted that there were articles of female clothing and cosmetics strewn across the master bedroom and master bathroom floors.[2]

After the fire was completely extinguished and the smoke had cleared, Brinkkoeter conducted a more thorough inspection of the home. He was assisted by Doug Vogel, an arson investigator from the New Braunfels Fire Department. Both men noted extensive fire and smoke damage throughout the home. The most significant damage was in the hall bathroom and the attic. Brinkkoeter and Vogel both testified that the fire originated in the hall bathroom. They came to this conclusion based on the level of damage to the bathroom and the V-pattern made by the fire as it burned up and out from the point of origin. Firefighter Van Ausdall also noticed the V-pattern coming from the bathroom and explained the phenomenon to the jury: "Typically a fire will start at one point, and then as the fire—the flames and smoke spread vertically, they will spread out. And as they spread out, they will—they will produce that V-pattern on the surface that they're closest to." Neither Brinkkoeter nor Vogel found any evidence that electrical wiring or appliances had malfunctioned and caused the fire. The arson investigators discovered clothes piled in the bathtub and on the bathroom floor and determined that the fire started when the clothes in the bathtub were ignited.

Brinkkoeter also received assistance from Thomas Hubertus, of the State Fire Marshal's office, who, along with his dog Buddy, searched the home for evidence of ignitable fluids.

---

[2] Brinkkoeter later learned from some of the firefighters that the clothing and cosmetics were strewn about the bedroom when they arrived, not as a result of the firefighting efforts.

Hubertus testified that Buddy is trained to detect the odor of ignitable liquids; he sits and stares at the strongest source of the odor until he is rewarded with a toy. When Hubertus and Buddy first went into the Ovalle home, Buddy alerted on the hall bathroom, but because there was so much debris in the bathroom, Hubertus was unable to pinpoint the source of the odor. The bathroom debris was then removed and spread out along the driveway so that Buddy could search it again. This time, he alerted on the remains of a shelving unit. Then, when Hubertus took Buddy through the home again, Buddy alerted on the toilet in the hall bathroom. Hubertus retrieved pieces of a broken hurricane lamp and a cigarette lighter from inside the toilet bowl.[3] Fragments of the shelving unit, the hurricane lamp pieces, and the cigarette lighter were all tested at the State Fire Marshal's Forensic Arson Laboratory by Sondra Budge. Budge testified that all three items tested positive for an ignitable fluid—specifically N-alkanes and medium petroleum distillates. While the test was not conclusive as to what the ignitable liquid was, Budge testified that the combination of the N-alkanes and medium petroleum distillates was consistent with lamp oil, such as would be found in a hurricane lamp. Budge also tested the clothing that Ovalle was wearing at the scene, and his clothes tested positive for the same compounds.

As part of his investigation, Brinkkoeter interviewed Ovalle and Lana on the day of the fire. Brinkkoeter testified that Ovalle did not appear distraught and that "he would barely answer the questions and just—he would answer to the question, and that was about it. Really no—no signs of anything." Ovalle said that he and Lana had been out drinking the night before, that he had passed

---

[3] Hubertus testified that, because Buddy is trained to alert on the strongest source of odor, he would not alert on other items in the bathroom—even if they also contained ignitable liquids—unless the commode was first removed from the bathroom.

out on a couch outside, and had woken up to the sound of the fire. Ovalle told Brinkkoeter that after calling 911, he attempted to go inside the home to look for his wife, whom he had not yet located. Brinkkoeter also noted that Ovalle was covered in soot and bleeding from a minor injury. Brinkkoeter learned from police officers from the New Braunfels Police Department, who were assisting at the scene, that Ovalle had repeatedly tried to enter the home while the firefighters were working and he had to be restrained by the officers. Police Officer Santiago Flores testified at trial that Ovalle showed signs of intoxication, including "bloodshot eyes, slurred speech, sway[ing] while he was walking, [and] the odor of an alcoholic beverage coming from his breath."[4]

Brinkkoeter next interviewed Lana, who arrived on the scene while the firefighters and arson investigators were still working.[5] Brinkkoeter testified that, in contrast to Ovalle, Lana was distraught and crying. Officer Flores testified that Lana "appeared a little hysterical" and seemed confused about what was happening. Lana told Flores that she and Ovalle had been out drinking the night before, that they had gotten into an argument, and Ovalle had left her at a bar and Lana had called her cousin, Angela Mendoza, to come pick her up.[6] According to Flores, Lana had

---

[4] Flores arrested Ovalle for public intoxication because he did not feel it was safe to leave Ovalle unattended and he did not want to release Ovalle to his wife because Ovalle had a history of domestic violence.

[5] Ovalle had eventually reached Lana on her cell phone and told her about the fire. Lana testified that she came straight home after receiving the call.

[6] At trial, Lana provided more detail regarding the events of May 24 and 25. She testified that she got off work at 4:00 p.m. and went out drinking with friends at a local restaurant. Ovalle met her at around 5:15 p.m. From there, they went to two other bars, both drinking several drinks at each location. Lana testified that, around 11:30 p.m., the two went home, where they got into an argument about whether or not to go out again to another bar. Eventually, Lana agreed to go with him to the bar "because otherwise things would have escalated" beyond a verbal dispute. They continued to argue while at the bar. Lana testified that Ovalle left the bar around 1:30 a.m., but that she refused to go with him because she was still scared of things escalating to physical violence.

her cousin take her to pick up her truck and then Lana drove to her cousin's to spend the night.[7] Lana told both Flores and Brinkkoeter that she stayed with her cousin because she feared that if she went home, the disagreement with Ovalle was going to escalate to physical violence, as had happened in the past.

Brinkkoeter and Vogel concluded, based on their investigation—including their inspections, the physical evidence, and the interviews—that Ovalle had started the fire by pouring lamp oil from the hurricane lamp on his wife's clothing and using the cigarette lighter that was found in the commode to set the clothing on fire. The fire had then spread from the clothing to the bathroom walls and ceilings and through the rest of the home. Brinkkoeter also testified that, because of the history of domestic violence and the fact that Ovalle used Lana's clothes to start the fire, Ovalle was likely motivated by spite. Both men were certain about their conclusions; Vogel testified that he was convinced beyond a reasonable doubt that Ovalle had deliberately started the fire, and Brinkkoeter testified that his conclusion was based on a reasonable scientific certainty.

Mack Fuller, a certified fire investigator who was hired by the company that insured the Ovalle home, also conducted an investigation to determine the cause and origin of the fire. The day after the fire, Fuller interviewed Ovalle and Lana and then inspected the exterior and interior of the home. Like the firefighters and the fire marshal, Fuller concluded that the fire started in the hall bathroom and was set intentionally. Fuller noticed a blistering pattern on the linoleum floor of the bathroom, which he noted is unusual because fire travels upward, and the floor is usually the coolest part of the house. According to Fuller, the blistering pattern was consistent with ignitable liquid

_____

[7] Mendoza testified at trial and confirmed that Lana had spent the night at Mendoza's apartment.

being poured or spilled on the floor. Fuller cut a sample from the bathroom floor and had it tested. Fuller testified that the results were consistent with the state lab's results for the items on which Buddy had alerted and was therefore likely lamp oil.[8] Fuller determined, to a reasonable scientific certainty, that "the cause of the fire was the distribution and subsequent ignition of an ignitable liquid." Fuller testified that he did not see any evidence that someone other than the fire department had attempted to suppress the fire or contain it in the bathroom.

Based on his inspection and his interview with Ovalle, Fuller also concluded that Ovalle was the person who had started the fire. Fuller recorded his interview with Ovalle, and the recording was published to the jury. In the interview, Ovalle stated that he did not know what area of the house the fire occurred in or how the fire started. Ovalle told Fuller he believed it was accidental, but could not articulate why he believed it was accidental. Ovalle acknowledged the home was insured, that it was subject to a mortgage, and that, at the time of the fire, he and Lana were three months behind in their mortgage payments. At trial, Fuller testified that Ovalle's responses aroused his suspicions:

> Well, I was a little bit concerned when I asked him about the accidental reasoning for the fire and him laughing, you know, instead of just giving me a direct answer, because this is a serious time . . . . And he tells me that he's on the patio asleep or passed out, but fortunately he was able to wake up in time. And if you're asleep, especially if you're inebriated, most of the time you're going to be there until the fire overcomes you where you're not going to be able to get up and get out of the

---

[8] The compounds found by the state lab and by Fuller's lab are found in items other than lamp oil; therefore, neither set of lab results could conclusively identify exactly what ignitable liquid was present. Fuller's lab results indicated that the compounds found on the linoleum pieces were consistent with a common floor adhesive. Fuller's conclusion that it was likely lamp oil instead was based on the similarity of his results to the state lab's, Budge's testimony that the state lab results were consistent with lamp oil, and the blistering pattern he observed on the floor.

structure. And then he tells me he only went—I don't know how far he went, but he went up towards where the fire was, but, yet, he doesn't see any flames . . . . And certainly after him going back through that fire before I got there the next day, he should have been able to tell me, "It looks like the worst fire was in my bathroom," whether or not he has enough knowledge to know how fires burn.

While Ovalle denied any knowledge of how the fire started when speaking to Fuller and the other investigators, his neighbor Ebert—who is a corrections officer with the Comal County Sheriff's Department—testified that when he came into contact with Ovalle at the county jail and inquired about the case, Ovalle said that, because he was angry with Lana, "he had put her clothes in the—in the front bathroom tub and set them on fire. I believe he said he had walked away and it got out of control."

*The Trial*

At trial, the various firefighters and investigators testified regarding the fire suppression efforts, the damage to the home, and the investigation that followed. In addition, Lana testified regarding her and Ovalle's activities on the night before the fire and the impact of the fire on her. Lana was still distraught—particularly over the death of Poopers. Lana testified that she and Ovalle jointly owned the dog, but that she was his primary caretaker. According to Lana, Poopers would run and hide under the bed in the master bedroom when he was scared, near where he was found by the firefighters. Lana also testified that, after the fire, the insurance company paid off the mortgage and she and Ovalle sold the home.

The defense called a single witness, Donald Nichols, a certified fire investigator who conducts fire origin and cause investigations. Nichols did not conduct his own investigation in this case or draw a conclusion as to who started the fire; rather, he reviewed the Brinkkoeter report and

9

testified as to what he would have done differently had he been conducting the investigation. Specifically, Nichols said he would have attempted to confirm where Lana was at the time of the fire, rather than taking Lana and Mendoza at their word, and would have taken written statements from every possible witness. However, Nichols acknowledged that he had the benefit of hindsight and that Brinkkoeter was operating under time constraints, and testified that Brinkkoeter "did a pretty decent job" conducting the investigation.

The jury found Ovalle guilty of: first degree arson, for having intentionally damaged the home; third degree arson, for having intentionally burned the clothing and recklessly damaged the home in the process; and cruelty to animals, for the death of the family dog. In four points of error, Ovalle challenges the third-degree-arson and cruelty-to-animals convictions as a violation of double jeopardy protections, attacks the legal and factual sufficiency of the evidence to support the animal cruelty conviction, and attacks the legal sufficiency of the evidence to support the first-degree-arson conviction.

## DISCUSSION

### Double Jeopardy

In his first point of error, Ovalle argues that his conviction for three crimes—first degree arson, third degree arson, and cruelty to animals—arising out of a single house fire violates the double jeopardy clauses of the federal and state constitutions. *See* U.S. Const. amend. V; Tex. Const. art. I, § 14. Ovalle contends that his convictions for third degree arson and for cruelty to animals must therefore be dismissed.

Where there are no underlying questions of fact, double jeopardy is a question of law we review de novo. *See Vasquez v. State*, 22 S.W.3d 28, 31-32 (Tex. App.—Amarillo 2000,

10

no pet.). Because Ovalle did not preserve his double jeopardy claims at or before the time that the charge was submitted to the jury, we may only reverse if the violation is apparent on the face of the record and if enforcement of the usual rules of procedural default would serve no legitimate state interests. *Langs v. State*, 183 S.W.3d 680, 685 (Tex. Crim. App. 2006); *Gonzalez v. State*, 8 S.W.3d 640, 643 (Tex. Crim. App. 2000); *Jimenez v. State*, 240 S.W.3d 384, 417 n.19 (Tex. App.—Austin 2007, pet. ref'd), *cert. denied* 129 S. Ct. 213 (2008).

Double jeopardy prevents multiple convictions for the same offense, not multiple convictions for separate and distinct offenses occurring during the same transaction. *United States v. Dixon*, 509 U.S. 688, 695-96 (1993); *Ex parte Cavazos*, 203 S.W.3d 333, 336 (Tex. Crim. App. 2006); *Lozano v. State*, 860 S.W.2d 152, 154 (Tex. App.—Austin 1993, pet. ref'd). To determine whether two offenses are the same or separate and distinct for double jeopardy purposes, we compare the elements of the offenses as alleged in the indictment. *See Blockburger v. United States*, 284 U.S. 299, 304 (1977); *Bigon v. State*, 252 S.W.3d 360, 370 (Tex. Crim. App. 2008). The two offenses are the same if one of the offenses contains all the elements of the other; they are separate and distinct offenses if each required proof of a fact which the other did not. *Blockburger*, 284 U.S. at 304; *Bigon*, 252 S.W.3d at 370. When a defendant is convicted for two offenses that are the same for double jeopardy purposes, the conviction for the most serious offense is retained and the other conviction is set aside. *See Ex parte Cavazos*, 203 S.W.3d at 338.

*Third Degree Arson*

The State concedes that third degree arson is a lesser-included offense of first degree arson and that, as such, conviction for both violates the double jeopardy prohibition. The first-

degree-arson charge encompasses each of the elements of third degree arson, with the distinction that they had to prove that Ovalle intentionally, rather than merely recklessly, caused damage to the residence. *See* Tex. Penal Code Ann. § 28.02(d)(2), (f). The legislature has specifically designated an offense as a "lesser-included" offense when "it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission." Tex. Code Crim. Proc. Ann. art. 37.09(3) (West 2006); *see also* Tex. Penal Code Ann. § 6.02(d) (West Supp. 2008) (classifying culpable mental states from highest to lowest). Therefore, we agree that third degree arson is a lesser-included offense of first degree arson and only one of the convictions may stand. *Langs*, 183 S.W.3d at 685 (offense and lesser-included offense are "same offense" for double jeopardy purposes). Because first degree arson is the more serious offense, we will set aside the third-degree-arson conviction. *See Ex parte Cavazos*, 203 S.W.3d at 338 (holding that "the 'most serious' offense is the offense of conviction for which the greatest sentence was assessed").

*Cruelty to Animals*

To prove the animal cruelty charge, the State had to show that Ovalle intentionally and knowingly killed Poopers, a dog belonging in whole or in part to Lana, by starting a fire inside the residence. *See* Act of May 24, 2001, 77th Leg., R.S., ch. 450, § 1, 2001 Tex. Gen. Laws 887 (amended 2007) (making it an offense to kill an animal, other than cattle, horses, sheep, swine, or goats, belonging to another without legal authority or owner's consent). To prove the first-degree-arson charge, the State had to show that Ovalle set Lana's clothes on fire with the intent to destroy or damage the home and that Ovalle:

12

- knew that the home was within the limits of an incorporated city or town;

- knew that the home was insured against damage or destruction;

- knew that the home was subject to a mortgage or other security interest;

- knew that the home was located on property belonging to another;

- knew that the home contained property belonging to another; or

- was reckless about whether the fire would endanger the life of someone or the safety of the property of another.

*See* Tex. Penal Code Ann. § 28.02(a), (d). The indictment charged Ovalle under six alternative theories, encompassing five of the six statutory grounds. The theory laid out in paragraph D of the indictment alleged that Ovalle endangered the safety of property owned by Lana—including her clothing, her personal effects, and the dog, Poopers. Ovalle argues that, because the first-degree-arson charge includes a theory that relies on endangering the safety of the dog owned in part by Lana and because the cruelty-to-animals charge for killing the same dog alleges that Poopers was killed as a result of the house fire, the two offenses are the same for double jeopardy purposes.[9]

---

[9] Ovalle's argument rests on the theory that both arson and cruelty to animals are property crimes and therefore both convictions punish Ovalle for the same damage to Lana's property resulting from the house fire. While our disposition of this issue means we need not reach the merits of this claim, we note that the penal code does not classify cruelty to animals as a property crime and that the extra protection the animal cruelty prohibitions provide animals is indicative of the unique relationship between people and their pets. *Compare* Act of May 24, 2001, 77th Leg., R.S., ch. 450, § 1, 2001 Tex. Gen. Laws 887 (amended 2007) (current version at Tex. Penal Code Ann. § 42.092 (West Supp. 2008)) (within Title 9, Offenses Against Public Order and Decency), *with* Tex. Penal Code Ann. §§ 28.01-35A.02 (West 2003 & Supp. 2008) (Title 7, Offenses Against Property). This relationship is exemplified by the New Braunfels Fire Department's actions in this case—the search and rescue team was looking for Poopers before the fire was under control, whereas Lana and Ovalle's other treasured possessions were not retrieved until the fire was under control and the home was made safe.

Even assuming that the cruelty-to-animals offense as charged is the same as the first-degree-arson offense as charged in paragraph D, the face of the record does not show a multiple punishments violation because the jury's general verdict of guilty of first degree arson could have rested on one of the other paragraphs of the indictment. *See Langs*, 183 S.W.3d at 687 (where jury charge includes alternative theories, only one of which would constitute double jeopardy, error is not apparent on face of record); *Gonzalez*, 8 S.W.3d at 645 (same). The jury was presented with evidence that Ovalle knew the home was located within the New Braunfels city limits (paragraph A), knew that it had Lana's property—her clothing—located within it (paragraph B), was reckless about whether the fire would endanger the lives of the firefighters who responded to the fire (paragraph C), knew that the home was insured against damage or destruction (paragraph E), and knew that the home was subject to a mortgage or other security interest (paragraph F). Each of these theories was then listed in the disjunctive in the jury charge, reflecting that the State only needed to prove one of the theories to prove the first-degree-arson charge. Because we do not know on which theory the jury relied in convicting Ovalle, there is no double jeopardy violation clearly apparent from the face of the record. *See Langs*, 183 S.W.3d at 687 ("The fact that the jury's verdict *could* have relied on a theory that would violate the Double Jeopardy Clause, is not sufficient to show a constitutional violation 'clearly apparent on the face of the record.'" (emphasis in original) (quoting *Gonzalez*, 8 S.W.3d at 643)).

Furthermore, in a situation such as this, enforcement of the usual rules of procedural default—requiring Ovalle to timely raise his double jeopardy claim below—serves a legitimate state interest. *See Gonzalez*, 8 S.W.3d at 645-46. If Ovalle had raised his double jeopardy claim below, the State would have had the opportunity to remove the offending paragraph and obtain a first-

degree-arson conviction based on one of the other alternative theories. *See id.* Therefore, "[w]hen offenses, one of which could give rise to a multiple-punishment double-jeopardy violation, are listed disjunctively in a jury charge, the burden is upon the defendant to 'preserve, in some fashion, a double jeopardy objection at or before the time the charge is submitted to the jury.'" *Langs*, 183 S.W.3d at 687 (quoting *Gonzalez v. State*, 973 S.W.2d 427, 431 (Tex. App.—Austin 1998), *aff'd*, 8 S.W.3d 640 (Tex. Crim. App. 2000)).

Because there is no error clearly apparent on the face of the record and because enforcement of the usual rules of procedural default serves a legitimate state interest, Ovalle was required to timely object in order to preserve error. He did not do so; therefore, the animal cruelty conviction is not barred by double jeopardy.

**Sufficiency of the Evidence**

In his second and third points of error, Ovalle challenges the legal and factual sufficiency of the evidence to prove the animal cruelty charge. In his fourth point of error, he challenges the legal sufficiency of the evidence to prove the first-degree-arson charge.

In reviewing the legal sufficiency of the evidence, we review all of the evidence in the light most favorable to the verdict. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). The question presented is whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *Clayton*, 235 S.W.3d at 778. We assume that the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict. *Clayton*, 235 S.W.3d at 778.

15

In reviewing the factual sufficiency of the evidence, we consider all the evidence in a neutral light, while giving due deference to the jury's determination. *See Sims v. State*, 99 S.W.3d 600, 601 (Tex. Crim. App. 2003); *Vasquez v. State*, 67 S.W.3d 229, 236 (Tex. Crim. App. 2002). This involves a two-part inquiry. *See Johnson v. State*, 23 S.W.3d 1, 6-7 (Tex. Crim. App. 2000). We first look at the evidence presented in support of the guilty verdict and reverse only if the evidence "is so weak as to be clearly wrong and manifestly unjust." *Id.* at 11. If the evidence that tends to prove the verdict is sufficient standing alone, we then compare it with the evidence the defendant produces against the verdict, *id.* at 7, and reverse only if after the comparison the verdict "is against the great weight and preponderance of the available evidence," *id.* at 11. The jury is the sole judge of the credibility of the witnesses and the weight to be accorded their testimony. *Vasquez*, 67 S.W.3d at 236. We may not reweigh the evidence and substitute our judgment for that of the jury. *Watson v. State*, 204 S.W.3d 404, 417 (Tex. Crim. App. 2006); *King v. State*, 29 S.W.3d 556, 563 (Tex. Crim. App. 2000).

*Cruelty to Animals*

Ovalle committed the offense of cruelty to animals if he intentionally or knowingly killed Poopers without Lana's effective consent. *See* Act of May 24, 2001, 77th Leg., R.S., ch. 450, § 1, 2001 Tex. Gen. Laws 887 (amended 2007). Ovalle argues that the evidence is legally and factually insufficient to prove that he intentionally or knowingly killed Poopers.

A person acts intentionally when it is his conscious desire to cause the result of his conduct. Tex. Penal Code Ann. § 6.03(a) (West 2003). A person acts knowingly when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b). A person's knowledge and

16

intent may be inferred from the "acts, words, and conduct of the accused." *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002); *see also Pine v. State*, 889 S.W.2d 625, 629 (Tex. App.—Houston [14th Dist.] 1994, pet. ref'd) (knowledge and intent to commit offense of cruelty to animals may be inferred from circumstances surrounding offense).

The jury was presented with ample circumstantial evidence from which it could infer that Ovalle knowingly or intentionally killed Poopers. The jury heard testimony that Poopers was an inside dog, and that he hid under the bed in the master bedroom when he was scared. From this, the jury could have inferred that Ovalle knew when he started the fire and walked out that Poopers was reasonably certain to be killed in the fire he started.

Furthermore, Brinkkoeter testified that Ovalle's actions in starting the blaze were likely motivated by spite. The jury was presented with evidence that Ovalle was intent on destroying his wife's property. He used her clothing, not his, to start the fire, and he threw her make-up and jewelry on the floor. The jury also heard testimony that Poopers was more Lana's dog than Ovalle's, and that Lana was emotionally attached to her pet. From this, the jury could have reasonably determined that Ovalle consciously desired to kill the dog in the fire in order to cause Lana emotional pain.

The evidence of Ovalle's actions and the motivation behind them was enough to allow a reasonable jury to find beyond a reasonable doubt that Ovalle knowingly and/or intentionally killed Poopers; therefore, the evidence is legally sufficient to support the cruelty-to-animals charge, and we overrule Ovalle's second point of error.

Likewise, there was not so little evidence in support of the verdict as to render it clearly wrong or manifestly unjust. Ovalle did not present any evidence of his intent, or lack thereof,

17

to counteract the State's evidence and render it against the great weight and preponderance of the evidence. While his neighbor testified that Ovalle was calling for his wife, there was no testimony or evidence to indicate that Ovalle expressed any concern for Poopers or made any attempt to rescue the dog before the fire got out of control. On appeal, Ovalle urges us to consider his testimony at the punishment phase—in which he expressed remorse for Poopers' death—in evaluating the factual sufficiency of the evidence. However, we do not consider evidence offered during the punishment phase when evaluating the factual sufficiency of the evidence to establish a defendant's guilt. *See Barfield v. State*, 63 S.W.3d 446, 450 (Tex. Crim. App. 2001) ("In a bifurcated trial on a plea of not guilty, 'our consideration of the evidence is necessarily limited to that evidence before the jury at the time it rendered its verdict of guilt.'" (quoting *Munoz v. State*, 853 S.W.2d 558, 560 (Tex. Crim. App. 1993))); *Bryant v. State*, 135 S.W.3d 130, 135 n.4 (Tex. App.—Waco 2004) (refusing to consider State's evidence presented at punishment in legal sufficiency challenge), *rev'd on other grounds*, 187 S.W.3d 397 (Tex. Crim. App. 2005). We hold that the evidence is factually sufficient to support Ovalle's conviction for cruelty to animals, and we overrule his third point of error.

*First Degree Arson*

To prove the first-degree-arson charge, the State had to show that Ovalle set Lana's clothes on fire with the intent to destroy or damage the home and that Ovalle:

- knew that the home was within the city limits of New Braunfels;

- knew that the home was insured against damage or destruction;

- knew that the home was subject to a mortgage or other security interest;

18

- knew that the home contained property, specifically clothing, belonging to Lana;

- was reckless about whether the fire would endanger the life of the firefighters who responded to the 911 call; or

- was reckless about whether the fire would endanger the safety of Lana's property, specifically her clothing, her personal effects, and the family dog.

*See* Tex. Penal Code Ann. § 28.02(a), (d). Ovalle argues that the State failed to prove beyond a reasonable doubt that, when he set the clothes on fire, he intended to destroy or damage the home. Ovalle contends that the evidence only supports a finding that he intended to destroy the clothing and that the fire got out of his control and damaged the home. We disagree. The evidence of Ovalle's behavior before, during, and after the fire supports a reasonable inference that Ovalle intended to damage the home.

Lana testified that Ovalle was arguing with her much of the evening before the fire. In fact, according to Lana, he was so angry with her that she feared his anger was escalating and he would do something to hurt or even kill her. From this, the jury could have determined that he was angry enough with her to intentionally damage or destroy the home they shared.

The circumstantial evidence of Ovalle's actions as he set the blaze also support an inference that he intended to damage the home. Ovalle set fire to the clothes inside the house, not outside. He did not just burn the clothing, but poured lamp oil on the fire, thus increasing the intensity of the fire and the speed at which it spread. Further, the evidence indicated that he poured the lamp oil, not just on the clothes, but on the shelving units and the floor as well, which guaranteed that the fire would spread and cause damage to the home's structure. There is absolutely no evidence that Ovalle stayed to monitor the fire and ensure that it remained under control, nor is there evidence

19

that he attempted to contain it in the bathroom or put it out when it began to spread—by, for example, turning on the shower head that was just above the burning clothes. Instead, by his own admission to Ebert, he set the fire and walked away, leaving it to spread through the home. From this evidence of Ovalle's acts and omissions, the jury could have reasonably determined that Ovalle intended for the fire to spread and damage the home.

Finally, the jury could have inferred his intent to damage the home from his conduct after the fire. Ovalle was not candid with the fire investigators; he denied any knowledge of how or even where the fire started. Months later, he admitted to his neighbor that he had intentionally started the fire inside the home, but claimed that it had gotten out of control. Thus, the jury heard testimony that Ovalle had been dishonest with the fire investigators, and this dishonesty, combined with the evidence that Ovalle knew the home was insured and that he was three months behind on his mortgage, could have led a reasonable jury to conclude that Ovalle intended to damage or destroy the home so that he could collect the insurance money and pay off his mortgage.

The State presented sufficient evidence of Ovalle's behavior before, during, and after the fire to allow a reasonable jury to conclude beyond a reasonable doubt that Ovalle intended to damage the home when he poured lamp oil on and around his wife's clothes, ignited the fire inside the home, and walked away, allowing the fire to spread uncontrolled.[10] Therefore, the evidence is

---

[10] During jury deliberations, the jury sent a note to the trial court noting that it had reached a decision on the third-degree-arson and cruelty-to-animal charges but was deadlocked on the first-degree-arson charge. The court instructed the jury to keep deliberating. On appeal, Ovalle points to the jury's note as "illustrat[ing] the weakness of the evidence" on the first-degree-arson charge and appears to suggest that the jury was not in fact convinced beyond a reasonable doubt. The trial court's response did not pressure the jury to reach a particular verdict and did not convey the trial court's opinion of the case. *See Howard v. State*, 941 S.W.2d 102, 125 (Tex. Crim. App. 1996).

factually sufficient to support the conviction for first degree arson, and we overrule Ovalle's fourth point of error.

## CONCLUSION

Because the double jeopardy clause bars Ovalle's conviction for third degree arson, his conviction for that count is reversed and the prosecution is dismissed. We overrule all other points of error and affirm the judgments of conviction for first degree arson and cruelty to animals.

_____

Diane M. Henson, Justice

Before Chief Justice Jones, Justices Puryear and Henson

Affirmed in part; Reversed and Dismissed in part

Filed:   June 19, 2009

Do Not Publish

---

Therefore, the fact that the jury was initially deadlocked does not impact our legal and factual sufficiency analysis. *See Smith v. State*, No. 02-05-322-CR, 2006 Tex. App. LEXIS 4731, at *7 (Tex. App.—Fort Worth June 1, 2006, pet. ref'd) (mem. op., not designated for publication); *cf. Williams v. State*, No. 14-06-132-CR, 2007 Tex. App. LEXIS 7682, at *9-10 (Tex. App.—Houston [14th Dist.] Sept. 25, 2007, no pet.) (mem. op., not designated for publication) (fact that prior trial ended in mistrial because of jury deadlock does not impact factual sufficiency review).